IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-10046
_____


ARMANDO H. GONZALES,

                                    Plaintiff-Appellee,

                     versus

DALLAS COUNTY, TEXAS, ET AL,

                                    Defendants,

AURELIO CASTILLO and CONNIE KIRBY,

                                    Defendants-Appellants.
_____

Appeal from the United States District Court for the
                Northern District of Texas
_____

May 4, 2001

Before JOLLY and DAVIS, Circuit Judges, and RESTANI[*] Judge.

E. GRADY JOLLY, Circuit Judge:

     The district court denied qualified immunity to these

defendant-appellant Dallas County, Texas constables.  They are

alleged to have discharged the plaintiff-appellee, Armando

Gonzales, in retaliation for his exercising his First Amendment

rights.  We reverse the district court's order.  Although it is

_____

     [*]Judge of the United States Court of International Trade,
sitting by designation.

true that Gonzales engaged in activity protected by the First Amendment when he testified before a grand jury investigating corruption in the constable's department, the discharge was objectively reasonable with regard to Gonzales's constitutional rights. We reach this conclusion in the light of Gonzales's subsequent conduct of using excessive force and because the record demonstrates that the discharge was justified on grounds unrelated to his First Amendment rights and would have occurred notwithstanding his exercise of such rights.

I

A

In early 1997, Aurelio Castillo, the newly-elected Constable of Precinct 6 of Dallas County, instructed several of his deputies, including Armando Gonzales, to solicit "contributions" from several bail bondsmen. The understanding, according to Gonzales, was that the bondsmen who gave money to Castillo would receive assistance from the constable's department in locating and arresting bond-jumpers. Fearing that he would be terminated if he refused to solicit, Gonzales followed Castillo's instructions.

By September 1997, Gonzales had become concerned about the propriety of these contributions and reported the activity to an assistant district attorney. The Dallas County Grand Jury then began its investigation and subpoenaed Gonzales. When Castillo learned of the grand jury investigation, he asked his mother to

2

persuade Gonzales to sign a statement that he had no knowledge of solicitations from the bail bondsmen. Gonzales refused to sign, and when Castillo confronted him personally, Gonzales said that the prepared statement was false and that he would not perjure himself. Gonzales testified before the grand jury, which in October 1997 returned an indictment against Castillo for the felony offense of bribery.[1]

B

In mid-November, about six weeks after being indicted for bribery, Constable Castillo learned that deputy Gonzales had been involved in an altercation while working part-time as a uniformed security guard at a large supermarket. The following facts are undisputed: An unarmed man, who was shopping with his seven year old son, shoplifted several pair of socks worth approximately $30. While apprehending the shoplifting suspect, Gonzales drew his 9mm semi-automatic pistol, struck the suspect on the head with his gun, and twice sprayed the suspect in the face with pepper spray. (Gonzales argues that such force was necessary under the circumstances.) The Dallas City Police arrived at the scene and took the suspect to a hospital where he was treated for his injuries. Gonzales did not report this incident either to Castillo or Kirby, but the supermarket manager contacted the constable's

---

[1]In his briefs on appeal, Castillo informed this court that he was acquitted on the felony bribery charge following a jury trial in February 2000.

office several days after the incident.

C

Chief Deputy Constable Connie Kirby was responsible for investigating all allegations of inappropriate conduct and submitting written findings and a recommendation regarding disciplinary action to Constable Castillo. The supermarket manager advised Kirby that officials from the store's corporate office had investigated the incident and determined that Gonzales's conduct (as well as that of the assistant store manager who was on duty when the incident occurred) was inappropriate, dangerous, and "stupid." Specifically, they found that Gonzales had violated store policy by employing excessive force in apprehending a shoplifting suspect and by bragging about the incident afterwards. The corporate office decided that neither the assistant manager nor Gonzales should be allowed to work at the store again.

In the course of investigating this incident, Kirby interviewed and obtained statements from Gonzales, the shoplifter, and three store employees who witnessed the incident. Although Gonzales contended that he had used force only because it was necessary to defend himself, several store employees told Kirby that Gonzales was not in danger. One employee stated that the shoplifter "at no time tried to fight the officer or the manager." Another employee testified that the shoplifter was being detained by a store employee and appeared to be trying to escape through the

4

door when Gonzales hit him.  The shoplifter admitted that he was "struggl[ing] to get loose" from a store employee but did not attempt to harm Gonzales.  The suspect also stated that he was handcuffed and lying on the restroom floor when Gonzales sprayed him with mace the second time.

Perhaps the most damning account that Kirby heard during his investigation came from another assistant store manager who arrived at work shortly after the incident.  The assistant manager stated that Gonzales approached him, telling him that he had "missed all the excitement."  Gonzales then explained, "in a bragging manner," that "A man stole something from the store and tried to escape. . . . I hit him in the head with my pistol and maced the [expletive deleted].  When he ran to the back of the store to the restroom to wash the mace from his eyes, I followed him in there and maced him again."

Chief Deputy Constable Kirby completed his investigation and submitted a report to Constable Castillo on December 10, 1997.  In this report, Kirby suggested that Gonzales's actions reflected a serious lack of judgment and constituted an "unnecessary and inappropriate use of force" because (1) the alleged offense was minor and did not warrant the level of force that Gonzales used; (2) by drawing the pistol, Gonzales increased the likelihood that the suspect could become violent; (3) Gonzales easily could have lost control of his weapon while wrestling with the suspect; and

5

(4) by using his pistol as a club, Gonzales ran the risk of having the gun discharge in the supermarket. Moreover, Gonzales's actions were inconsistent with the spirit of the precinct's "zero tolerance" policy concerning police brutality as well as with the rule that an officer's weapon should be drawn only when human life is endangered. Citing these reasons, as well as Gonzales's prior disciplinary problems,[2] Kirby recommended that Gonzales's employment be terminated.

On December 12, 1997, approximately two months after being indicted for bribery, Constable Castillo decided that Gonzales should be discharged. In a document entitled "Notice of Separation," Castillo remarked that "Due to the nature of the allegations brought upon Officer Gonzales, I do not have any faith or confidence [in] him regarding the use of unnecessary . . . force."

D

Gonzales not only disputes Kirby's factual conclusions but also raises questions about the manner in which Kirby conducted the

---

[2]The supermarket incident was not the first problem. In February 1997, Castillo suspended Gonzales for three days for executing a recalled arrest warrant. During the course of this investigation, Gonzales apparently admitted that he had not carefully read the warrant, which had the word "recall" written across it. Although Kirby recommended that Gonzales's employment be terminated, Castillo instead issued a formal reprimand and suspended Gonzales for three days. Castillo also ordered Gonzales to report immediately any future incident that could lead to a complaint against the constable's office. Gonzales did not contest this disciplinary action.

6

investigation. In his account of the incident, Gonzales contends that the suspect "lowered his head and was attempting to knock me down by physically striking me with his head and positively causing bodily injury to me." He argues that he used force only because it was necessary to defend himself and arrest the shoplifter. Although Gonzales was interviewed by Kirby during his investigation of the incident, he contends that he was not allowed to furnish evidence supporting his interpretation of the events at the supermarket. His argument may be summarized as follows.

First, Kirby did not interview Stephen Bynum, the assistant store manager who was involved in the incident. Bynum testified in an affidavit that the shoplifter struggled with both of them. Bynum stated that they were standing between the suspect and the door and that Gonzales pulled his pistol only after the suspect began moving quickly toward him.

Second, according to Gonzales, Kirby interviewed Sergio Alvarado, a produce clerk who witnessed the incident, but ignored any statements that supported Gonzales's account. In an affidavit, Alvarado stated that the suspect charged at Gonzales with his head down and began swinging his right arm: "From my view it looked like he was going to strike Mr. Gonzales in the face." Alvarado claims that he told Kirby about the man charging at Gonzales, but when Kirby prepared a written statement for him to sign, Kirby omitted the part about the suspect's attempt to strike Gonzales.

7

Third, Gonzales faults Kirby for not investigating the shoplifting suspect's criminal record. If Kirby had done so, Gonzales argues, he would have learned that the suspect had a prior conviction for resisting arrest and attempting to strike a police officer.

Fourth, Gonzales was not allowed to interrogate or confront witnesses whose statements were used to support the decision to terminate his employment.

In sum, Gonzales argues that a more complete investigation would have revealed that he had not used unnecessary force. In his view, such force was necessary considering that the suspect was attempting to injure Gonzales.

E

Gonzales did not supinely accept his discharge. A few days later, he filed a grievance with the Dallas County Civil Service Commission, which has the authority to review the discipline and discharge of county employees. On January 26, 1998, the Commission ordered that Gonzales be reinstated as deputy constable with full back pay, all benefits, and no break in service. The Commission's exact reasons for reinstating Gonzales are not clear. It appears, however, that the commission found that the pre-termination hearing did not comply with departmental or county regulations. Although Gonzales was reinstated with full back pay, he argues that he has not been reimbursed for his attorney's fees or for certain

8

consequential damages, such as his mental anguish and the loss of part-time employment as a security guard. Moreover, Gonzales claims that he has been "constantly harassed" since his reinstatement. He alleges, for example, that Castillo and Kirby have given him an excessive case load and extremely negative performance evaluation reports. Throughout 1998 and 1999, Gonzales continued to file grievances with the Civil Service Commission.

## II

In April 1998, Gonzales filed the instant complaint under 42 U.S.C. § 1983 seeking damages against Dallas County, Constable Aurelio Castillo, Chief Deputy Constable Connie Kirby, and Deputy Constable Alex Garcia, who had assisted Kirby in his investigation of the shoplifting incident.[3]

Gonzales's principal allegation is that the defendants retaliated against him because he had testified against Castillo before the grand jury. Gonzales also included claims for violating his right to due process, conspiring to obstruct judicial proceedings under 42 U.S.C. § 1985, violating the Texas Whistleblower Act, and intentionally inflicting emotional distress.

In December 1999, the district court granted the defendants' motion for summary judgment in part: (1) the due process claim because Gonzales had no property interest in his continued

_____

[3]Gonzales has voluntarily dismissed all charges against Garcia, and the district court has granted partial summary judgment for Dallas County.

9

employment; (2) the section 1985 claim because there was no proof of "class-based animus"; (3) the Texas Whistleblower Act claim because the Act did not create a private cause of action; and (4) the intentional infliction of emotional distress claim because such causes of action generally cannot be sustained in the context of employment disputes.

Thus, the only remaining claim was Gonzales's First Amendment retaliation claim brought under section 1983. The district court, however, limited Gonzales's retaliation claim to injuries arising from his temporary discharge that lasted from December 1997 to January 1998.

Castillo and Kirby argued that they were entitled to summary judgment on the retaliation claim on the basis of qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known."). The district court denied the motion, and Castillo and Kirby now appeal. Thus, the only issue in this appeal is whether Castillo and Kirby are entitled to qualified immunity from suit on the First Amendment retaliation claim.

10

Gonzales first contends that, because there are disputed issues of fact, we lack jurisdiction over this interlocutory appeal. We disagree.

When a public official seeks interlocutory review of an order denying qualified immunity, this court has jurisdiction to review the order "to the extent that it turns on an issue of law." Lemoine v. New Horizons Ranch & Center, Inc., 174 F.3d 629, 633-34 (5th Cir. 1999). We may therefore determine whether all of the conduct that the district court "'deemed sufficiently supported for purposes of summary judgment met the Harlow standard of "objective legal reasonableness."'" Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 531 (5th Cir. 1997)(quoting Behrens v. Pelletier, 516 U.S. 299, 313, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996)). Consequently, on interlocutory appeal the public official must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal. Berryman v. Rieger, 150 F.3d 561, 562-63 (6th Cir. 1998).

The jurisdictional question, then, is whether the record reflects undisputed facts upon which we may make a determination of the legal question before us: whether a reasonable public official could have believed, in the light of clearly established law, that the specific conduct of discharging Gonzales did not violate his

11

constitutional rights.[4] The mere existence of some factual dispute is not enough to defeat this court's jurisdiction over an interlocutory appeal: If the disputed facts are not material to this legal question, "the denial of summary judgment is reviewable as a question of law." Mendenhall v. Riser, 213 F.3d 226, 230 (5th Cir. 2000). Because this interlocutory appeal turns on a question of law that can be decided on undisputed material facts, we have jurisdiction.

B

We begin our analysis by assuming that Gonzales engaged in speech protected under the First Amendment. We will further assume that Gonzales suffered an adverse employment action when he was initially discharged, even though he was ultimately reinstated with back pay by the county. See Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir. 1999)(listing the elements of a First

---

[4]We emphasize that the legal question is not whether an officer would have known, in the abstract, that an employee could not be discharged in retaliation for protected First Amendment activities. Instead, we must ask whether a reasonable officer would have known that the *specific conduct* in issue violated the plaintiff's rights. See Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); Harlow, 457 U.S. at 819, 102 S.Ct. at 2739 ("Where an official could be expected to know that *certain conduct* would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action."). It is not necessary that there be a prior case holding the particular action in question unlawful, but "'in the light of pre-existing law the unlawfulness must be apparent.'" Petta v. Rivera, 133 F.3d 330, 334 (5th Cir. 1998)(quoting Anderson, 483 U.S. at 640, 107 S.Ct. at 3039).

12

Amendment retaliation claim).[5] Assuming these points, we focus on the principle that a public employer may escape liability by proving that it would have taken the same adverse employment action "even in the absence of the protected conduct." <u>Gerhart v. Hayes</u>, 217 F.3d 320, 321 (5th Cir. 2000)(citing <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 371 (1977)).[6] Thus, under the qualified immunity analysis, the question is whether it would have been objectively reasonable for an officer to conclude that terminating Gonzales's employment did not violate his rights under the First Amendment because his November 1997 altercation with the shoplifter would have caused his termination notwithstanding that he had testified against Castillo before the grand jury.

Even though there are some disputes as to what happened in the supermarket in November 1997, it is not for us to have a factual resolution of precisely what happened in the store; instead, we need only determine whether Castillo and Kirby, in discharging

---

[5]Because we assume that Gonzales established the elements of his retaliation claim, we need not address whether his prompt reinstatement by a county administrative tribunal precludes a finding of an adverse employment decision. <u>Compare</u> <u>Benningfield v. City of Houston</u>, 157 F.3d 369, 377 (5th Cir. 1998), <u>and</u> <u>Breaux v. City of Garland</u>, 205 F.3d 150, 158 (5th Cir. 2000), <u>with</u> <u>Frazier v. King</u>, 873 F.2d 820, 824 (5th Cir. 1989).

[6]As this court has made clear, First Amendment retaliation claims are governed by the <u>Mt. Healthy</u> "mixed-motives" framework, not by the <u>McDonnell Douglas</u> pretext analysis. <u>See</u> <u>Brady v. Fort Bend County</u>, 145 F.3d 691, 711-12 (5th Cir. 1998); <u>Mooney v. Aramco Serv. Co.</u>, 54 F.3d 1207, 1216 (5th Cir. 1995).

Gonzales, acted in an objectively reasonable manner, with respect to his constitutional rights, notwithstanding the conflicting accounts of the incident. We thus look to the "employer's knowledge, perceptions, and policies at the time of termination." Board of County Comm'rs v. Umbehr, 518 U.S. 668, 685, 116 S.Ct 1342, 1352, 135 L.Ed.2d 843 (1996).

It is also worth noting that we do not require government employers to make personnel decisions through methods that mirror court procedures, nor do we necessarily require employers always to resolve contradictory testimony in favor of the employee. See, e.g., Waters v. Churchill, 511 U.S. 661, 676, 114 S.Ct. 1878, 1888, 128 L.Ed.2d 686 (1994)(plurality opinion)(recognizing that "there will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion."). Thus, the fact that Castillo and Kirby may have relied on hearsay or made credibility determinations (i.e., that the employees' accounts of the events were more credible than Gonzales's) does not necessarily suggest that the decision to terminate Gonzales's employment was unreasonable.

We have also considered Gonzales's argument that Kirby carefully edited a witness's statement in order to put the incident in the worst possible light. One store employee, Sergio Alvarado, has stated in an affidavit that he told Kirby that the shoplifter

14

was running toward Gonzales with his arm upraised, but Kirby did not include this information in the written statement he prepared for Alvarado to sign. Ultimately, we do not consider Alvarado's subsequent affidavit to create a disputed issue of material fact as to whether Gonzales's discharge was unreasonable. First, there is no indication that it was unreasonable to give greater weight to the several other statements than to Alvarado's single account. Kirby had obtained sworn statements from other witnesses who said that Gonzales was not in danger and that the shoplifter was merely trying to escape through the door. Second, and more important, under established police procedures, Gonzales would not have been justified in drawing his weapon even if the shoplifter had attempted to strike him.

Therefore, even assuming that Kirby omitted part of Alvarado's testimony when preparing his written statement, we conclude that Gonzales has presented no material evidence suggesting that Kirby's investigation was so incomplete, biased, or otherwise untrustworthy that a reasonable public official would have been "made to hesitate," Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2739, before terminating Gonzales's employment.

Likewise, Gonzales has presented no evidence suggesting that Castillo's decision to fire him was unwarranted or unusual in the light of relevant departmental policies. On the other hand, there is considerable undisputed evidence, as we have suggested above,

15

that Gonzales's decision to draw his weapon on the shoplifting suspect (even assuming that the suspect charged at Gonzales) constituted improper conduct and was cause for termination. Castillo and Kirby point out, with little or no contradiction from Gonzales, that (1) in his two and a half years as a deputy constable, Gonzales had made several questionable decisions, including the February 1997 wrongful arrest on a recalled warrant; (2) department policy dictates that officers should draw their weapons only when life is threatened, and there was no evidence that the shoplifter posed any serious danger to the store's employees or patrons; (3) most of the employees stated that the suspect did not instigate the physical aggression with Gonzales; (4) an assistant store manager told Kirby that Gonzales had bragged about injuring the suspect; (5) the store manager informed Kirby that she had conducted a thorough investigation and concluded that Gonzales had used unnecessary force to subdue the shoplifter; (6) Gonzales's decision not to inform Kirby of the incident at the supermarket probably violated Castillo's direct order to inform him of such occurrences; and (7) constables from other precincts submitted affidavits stating that they would have terminated Gonzales's employment based on the information Kirby had obtained.

In the light of the record before us, we hold that a reasonable public official would have believed that the decision to terminate Gonzales's employment would not "violate clearly

16

established . . . constitutional rights" because the same employment action would have been taken even if Gonzales had not testified against Castillo before the grand jury. Therefore, Castillo and Kirby are entitled to qualified immunity from suit, and the district court should have granted summary judgment to the defendants on that basis with respect to the First Amendment retaliation claim, which is the only claim before us in this appeal.

IV

For the reasons set forth above, the district court erred in denying the defendants' motion for summary judgment on qualified immunity grounds. We therefore REVERSE the district court's order denying qualified immunity and REMAND the case for further proceedings not inconsistent with this opinion.

R E V E R S E D and R E M A N D E D.