# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 26, 2018

Lyle W. Cayce
Clerk

No. 17-60287

JOSEPH GERHART, Individually, and Next Friend of Brett Michael Gerhart, Ian Michael Gerhart, and Sarah Robillard, Minors; AMANDA JO GERHART, Individually, and Next Friend of Brett Michael Gerhart, Ian Michael Gerhart, and Sarah Robillard, Minors,

Plaintiffs – Appellees,

v.

JOHNNY BARNES, in his Official and Individual Capacity; BRETT MCALPIN, Deputy, in his official and individual capacity,

Defendants – Appellants.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:11-CV-586

Before BARKSDALE, DENNIS, and ELROD, Circuit Judges.

PER CURIAM:*

---

\* Pursuant to Fifth Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Fifth Circuit Rule 47.5.4.

No. 17-60287

The panel's prior opinion in this case is withdrawn and the following substituted in its place.

In this interlocutory appeal, Officer Johnny Barnes and Deputy Brett McAlpin appeal the denial of their summary-judgment motions on qualified-immunity and Mississippi tort-law grounds. We AFFIRM the district court's order denying summary judgment on qualified-immunity grounds as to Barnes's and McAlpin's unlawful-entry claim; DISMISS for lack of jurisdiction the interlocutory appeal of McAlpin's excessive-force claim; and REVERSE the denial of summary judgment on the Mississippi tort claim and RENDER judgment on that claim.

I.

A panel of this court previously ruled on an interlocutory appeal based on qualified immunity by the third individual, Agent Brad McLendon, who entered the Gerharts' home. *See Gerhart v. McLendon*, 714 F. App'x 327 (5th Cir. 2017).[1] The factual summary in *McLendon* is based on the statement of facts that the district court provided in its opinion granting in part and denying in part McLendon's motion for summary judgment. The district court did not set forth any findings of fact in its order allowing the Gerharts to proceed on some of their claims against Barnes and McAlpin, although it incorporated by reference the transcripts of a prior telephonic conference call and hearing with

---

[1] In that opinion, this court affirmed the district court's judgment determining that McLendon was not entitled to qualified immunity. *McLendon*, 714 F. App'x at 328–29. As stated in that opinion, "we lack jurisdiction to review the district court's factual findings" and thus "base our legal conclusions on the facts that the district court found sufficiently supported in the summary judgment record." *Id.* at 329 n.1. "Due to our limited jurisdiction, we cannot review the district court's factual findings. Nor do we have the benefit of the evidence as it will emerge at trial. Thus, our opinion should not be read to preclude dismissing this case on qualified immunity grounds at another point in the proceedings." *Id.* at 334 n.6.

2

the parties.  We therefore reiterate here the statement of facts from this court's

opinion in *McLendon*:

> By June 2010, Detective Jamie Scouten of the Pearl Police Department had spent several months investigating the residence at 473 Robert Michael Drive in Pearl, Mississippi.  As part of that investigation, Scouten used a confidential informant ("CI") to conduct "buy-bust" operations in which the informant would purchase methamphetamine at the residence. The U.S. Drug Enforcement Administration ("DEA") learned about Scouten's operation.   It requested that he conduct another buy-bust operation in order to "freshen up" the probable cause for arrest and search warrants.  Based on the DEA's interest, Scouten requested back-up from other law enforcement agencies, including Rankin County and the Rankin County District Attorney's Office.  Prior to the operation, he prepared warrants and supporting affidavits for 473 Robert Michael Drive.  The plan was for the CI to purchase methamphetamine and bring it to the officers, who would test it. Scouten would then fill in the salient details in the warrant and get a judge's approval.
>
> . . . .
>
> The operation took place on June 7, 2010.  Scouten held a briefing beforehand at the police station.  During that briefing, Scouten told all of the officers participating that the target residence was 473 Robert Michael Drive.  He then wrote "473 Robert Michael Drive" across the top of a sheet of paper and asked the CI to draw a diagram of the interior of the residence.  Scouten and the CI also went over a number of other key details during that briefing, including the location, the persons involved, the type of narcotics, and the identity of the CI.   This last piece of information was key because if the officers needed to enter the residence, it was important for the CI's safety that they could identify her.  Scouten used Google Earth images to familiarize officers with the location and appearance of the target residence. Scouten also mentioned that an unusual van with a "dualie [sic] axle" was parked in the driveway of the target residence.  Because the target residence had burglar bars around all windows, Scouten told the others that they would have to enter through a side door.[2]
>
> . . . .

---

[2] The Gerhart house did not have any burglar bars.

No. 17-60287

Scouten divided the officers into several vehicles, making sure that at least one officer in each vehicle could access the Pearl Police Department's radio channels. McLendon was assigned to a vehicle with two other officers: Brett McAlpin of the Rankin County Sheriff's Department and John Barnes of the Pearl Police Department. Barnes, McAlpin, and McLendon were tasked with stationing themselves at the end of Robert Michael Drive, where they would maintain visual contact with the residence in order to track the CI and ensure that no suspects left. They were the only officers who could see the target residence. The others were parked out of sight at a nearby church.

The CI and the officers left the station around 7:00 p.m. The plan was for McLendon to follow the CI to the residence. McLendon insisted that he did not follow the CI to the target residence, though others testified that he did. Barnes and Scouten, for instance, both testified that McLendon had to brake as the CI turned into the driveway of the target residence in order to avoid hitting her vehicle. McLendon then drove past the residence for about 200 yards, turned around, and parked facing the residence. It was still daylight when they arrived, weather conditions were normal, and the terrain between the officers and the target residence was level.

Barnes, McAlpin, and McLendon gave inconsistent testimony about who identified the target residence and how. Barnes claimed that he identified the target residence (at 473 Robert Michael Drive) correctly and pointed out the van with the unusual "dualie [sic] axle." McAlpin initially testified that both Barnes and McLendon identified 481 Robert Michael Drive as the target residence, though he later stated that only Barnes did so. McLendon also testified that Barnes identified 481 Robert Michael Drive as the target residence as they drove past and that he specifically pointed to a young man standing outside that residence.

The CI entered 473 Robert Michael Drive and bought $600 of methamphetamine. Suddenly, the CI texted Scouten to tell him she was in danger. Scouten broadcast to the other officers that the CI was in danger. He told them to converge on the target residence and do everything they could to help the CI. All vehicles acknowledged the signal—except McLendon's. Barnes testified that he had turned his radio off because McLendon was trying to tune into the radio broadcast from the CI's recording equipment.

4

No. 17-60287

Scouten specifically requested a response from McLendon's vehicle. Barnes replied that he did not hear the prior transmission, and Scouten repeated it. McAlpin was aware of the second call to go to the target residence, whereas McLendon testified that it never happened.

Meanwhile, Brett Gerhart was standing in front of his house at 481 Robert Michael Drive when he noticed McLendon's black Cadillac Escalade drive by and park at the end of the street. Some time later, he heard McLendon's tires screech as McLendon raced toward the Gerhart residence. McLendon drove onto the Gerharts' yard and parked between some trees. According to Brett, the blue siren lights on McLendon's car were not on, and so there was no indication that it was a police vehicle. As Scouten was rounding the corner, he saw McLendon driving down the street. After Scouten got out of his vehicle, he heard yelling and saw McAlpin, McLendon, and Barnes running across the Gerhart yard and into the house.

Barnes, McAlpin, and McLendon got out of the vehicle and pulled out their weapons. McAlpin told Brett to get on the ground, though it is disputed whether he identified himself as a police officer. All three officers were, however, wearing vests identifying them as police officers. Brett testified that he did not notice the vests until the officers left. When [McLendon's] vehicle came to a stop on the Gerharts' yard, Brett ran into the residence through a side door and locked the door behind him. He went through the residence, shouting, "They have guns!" McAlpin kicked in the side door and started to chase Brett. Brett testified that he then ran through the front door to prevent intruders from coming into the house. According to Brett, McAlpin caught him at the front door, threw him to the ground, and began kicking him in the side and back of the head. McAlpin acknowledges that he pointed his gun at Brett's head but denies kicking him. McAlpin then brought Brett into the living room.

McLendon encountered Joseph Gerhart, Brett's father, when he entered the residence. Joseph was on the floor by that time, and McLendon aimed his gun at Joseph's face. When Joseph tried to get up to help his son, McLendon put his hand on Joseph's back and repeatedly told him to stay down. Barnes was the last to enter the residence, where he encountered Amanda Gerhart in a fetal position, holding a baby in her arms. Amanda testified [that] she only assumed a fetal position after Barnes pointed his gun at

5

No. 17-60287

her.  After Barnes asked for Amanda's name, he realized that they were in the wrong house.  Amanda, however, testified that Barnes never said anything to her.  She managed to retreat to her son Ian's room and told him to call 911.  Ian made the call and told the operator that there were men with guns in the house.

Barnes found McAlpin in the living room, where he had Brett pinned to the ground.  After Barnes told McAlpin that they were in the wrong house, McAlpin got off of Brett and left.  McLendon likewise left when he discovered that they were in the wrong house.

While Barnes, McAlpin, and McLendon were inside the Gerhart residence, Scouten and the other officers had converged on the target residence.  After Scouten arrived, he initially believed that it would not be possible to get in without breaching tools, and he went to look for McAlpin, who was supposed to bring them to the target residence.  He walked toward the Gerhart residence and saw McAlpin and McLendon leaving.  Someone yelled from the target residence that they had finally managed to break in without the breaching tools, and Scouten returned to the target residence.

Brett suffered injuries to his face and neck, and the city of Pearl ultimately paid for the door that McAlpin destroyed.  The Pearl Police Department also conducted an investigation of the incident, which concluded that the officers were inattentive.

*McLendon*, 714 F. App'x at 329–32 (footnote omitted).

II.

A. Jurisdiction

We have jurisdiction to review a district court's denial of a claim of qualified immunity; such a denial, to the extent it turns on an issue of law, is an immediately appealable "final decision" under 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27, 530 (1985).  This is so because qualified immunity is "an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526.  On interlocutory appeal of the denial of a motion for summary judgment based on qualified immunity, our jurisdiction "extends to such appeals only 'to the extent that the denial of summary judgment turns on an

6

issue of law.'" *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc) (quoting *Mitchell,* 472 U.S. at 530). In denying an official's motion for summary judgment based on qualified immunity, the district court makes two distinct determinations, at least implicitly. *Id.* "First, the district court decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law. Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Id.* On interlocutory appeal, we have jurisdiction to review only the first type of determination. *Id.*

Thus, "[i]n deciding an interlocutory appeal of a denial of qualified immunity, we can review the *materiality* of any factual disputes, but not their *genuineness*." *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000). "A fact is '*material*' if it '*might affect* the outcome of the suit under the governing law.'" *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Id.* "We review the materiality of fact issues *de novo*." *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc), *cert. denied*, No. 17-1095, 2018 WL 707021 (Apr. 16, 2018). "When the district court fails to set forth the factual disputes that preclude granting summary judgment, we may be required to review the record in order 'to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed.'" *Kinney*, 367 F.3d at 348 (quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)).

## B. Standard of Review

"Our standard of review for interlocutory appeals differs from the usual Federal Rule of Civil Procedure 56 standards for summary judgment." *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 621 (5th Cir. 2006); *see also Kinney*, 367 F.3d at 347. Normally, of course, we review a district court's denial

No. 17-60287

of summary judgment *de novo*. *Kinney*, 367 F.3d at 347. However, on an immunity-based interlocutory appeal of a denial of summary judgment, "we do not apply the standard of Rule 56 but instead consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Id.* at 348.

## C. Qualified Immunity

To overcome the defense of qualified immunity, plaintiffs must show first that "the official violated a statutory or constitutional right" and second that "the right was 'clearly established' at the time of the challenged conduct." *Melton*, 875 F.3d at 261 (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)). "Although a case *directly* on point is not necessary, there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Id.* at 265 (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)). Thus, "a clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

"Because the plaintiff is the non-moving party, we construe all facts and inferences in the light most favorable to the plaintiff." *Id.* at 261. Thus, "on interlocutory appeal the public official must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal." *Gonzales v. Dallas County*, 249 F.3d 406, 411 (5th Cir. 2001).

## III.

### A. Unlawful Entry

The officers contend that the unlawful-entry claim fails because the district court's order refers to this claim as one for "Fifth Amendment violations under 42 U.S.C. § 1983 for unlawful entry," even though the Fifth

Amendment does not apply to claims against municipal actors like Barnes and McAlpin. *See Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996) ("[T]he Fifth Amendment applies only to the actions of the federal government . . . ."). However, this appears to be a mere scrivener's error, as the district court conducted a lengthy Fourth Amendment analysis on the same unlawful-entry claim asserted against McLendon. *See Gerhart v. Rankin County*, No. 3:11-CV-586-HTW-LRA, 2017 WL 1238028, at *10–12 (S.D. Miss. Mar. 31, 2017), *aff'd sub nom. Gerhart v. McLendon*, 714 F. App'x 327 (5th Cir. 2017).

"A warrantless search of a home is presumptively unreasonable, absent probable cause, consent, or exigent circumstances." *McLendon*, 714 F. App'x at 333 (citing *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001)). Officials do not violate the Fourth Amendment by entering the incorrect residence when their conduct is "consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *See Maryland v. Garrison*, 480 U.S. 79, 88 (1987) (considering whether a seizure of contraband violated the Fourth Amendment when the seizure occurred before the officers realized that they had entered the wrong third-floor apartment that was also on the premises described in the warrant). In *Garrison*, the Court stated that "[i]f the officers had known, *or should have known*, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to [the correct] apartment." *Id.* at 86 (emphasis added). The Court concluded that "[t]he objective facts available to the officers at the time *suggested no distinction* between [the correct] apartment and the third-floor premises." *Id.* at 88 (emphasis added).

In addition to the guidance of *Maryland v. Garrison*, a robust consensus of persuasive authority supports the principle from *Garrison* that officers'

conduct should be "consistent with a reasonable effort to ascertain and identify the place intended to be searched." *See id.* Perhaps most notable is *Hunt v. Tomplait*, 301 F. App'x 355 (5th Cir. 2008), which this court relied on in *McLendon* as directly on-point. *See McLendon*, 714 F. App'x at 333.

In *Hunt*, we affirmed the district court's determination that officers were not entitled to qualified immunity from Fourth Amendment claims involving an unlawful entry. 301 F. App'x at 356. The officers in *Hunt* attempted to apprehend a suspect who had evaded arrest by allegedly exchanging gunfire with Houston police and attempting to run over a uniformed officer with his vehicle. *Id.* Using information obtained in part from a cellular tracking device, the officers obtained a warrant for the suspect's father's residence. *Id.* However, the officers leading the search did not read the warrant and instead assumed that the suspect was at a different property, where one of the officers knew that some of the suspect's relatives lived. *Id.* at 357. As a result, the officers searched the wrong home. *Id.* at 357–58. We held that the district court did not err in determining that the officers' attempts to locate the correct residence did not "constitute a reasonable effort to ascertain the place to be searched." *Id.* at 361–62.

In *Hartsfield v. Lemacks*, the Eleventh Circuit considered a factually similar unlawful entry. 50 F.3d 950 (11th Cir. 1995), *as amended* (June 14, 1995). In *Hartsfield*, the officer leading the search had previously accompanied a confidential informant to the residence listed in the warrant. *Id.* at 951. The Eleventh Circuit relied in part on evidence before the district court that showed that the houses were separated by at least one other residence and that their appearances were distinguishable. *Id.* at 952. One witness testified that the house incorrectly entered had a fence around it and that the house described in the warrant had "junk cars strewn outside." *Id.* Of key importance to the Eleventh Circuit, it was undisputed that the unlawful entry took place during

daylight hours and that the house numbers were clearly marked. *Id.* Accordingly, the Eleventh Circuit reversed the district court's immunity-based grant of summary judgment to the officer on the unlawful-entry claim, holding that given in part "the guidance of the *Garrison* [C]ourt's description of reasonable police efforts, all reasonable police officers should have known that [the officer's] acts—searching the wrong residence when he had done nothing to make sure he was searching the house described in the warrant—violated the law." *Id.* at 955–56 (citing *Duncan v. Barnes*, 592 F.2d 1336, 1337–38 (5th Cir. 1979); *Wanger v. Bonner*, 621 F.2d 675, 681–82 (5th Cir. 1980)). In *Hunt*, we stated that "[t]he reasoning in *Hartsfield* is sound." 301 F. App'x at 362–63.[3]

In *Dawkins v. Graham*, the Eighth Circuit affirmed the district court's denial of summary judgment to officers based on qualified immunity on an unlawful-entry claim. 50 F.3d 532, 534 (8th Cir. 1995). The officers in *Dawkins* entered a house at "611 Adam" instead of "611 Byrd"; Adam Street was a block before Byrd Street. *Id.* at 533. Among other facts the Eighth Circuit noted, the relevant houses were different colors, and Adam Street and Byrd Street were clearly marked. *Id.* at 534. Applying *Garrison*, the Eighth Circuit held that the "objective facts available to the officers at the time of the raid distinguished the premises at 611 Adam from the premises at 611 Byrd." *Id.* at 534–35. Therefore, summary judgment in favor of the officers on

---

[3] In distinguishing its facts from those at issue in the Eleventh Circuit's decision in *Hartsfield*, this court in *Rogers v. Hooper* emphasized both the fact that the *Rogers* operation took place at night and the fact that the relevant houses were next door to each other. 271 F. App'x 431, 434–35 (5th Cir. 2008) (affirming grants of summary judgment to officers based on qualified immunity). The scenario underlying *Gerhart* is easily distinguishable from the scenario in *Rogers*; importantly, the operation at issue in *Gerhart* took place during the day, and the relevant homes were not immediately next door to each other.

qualified immunity was inappropriate in part because "the law prohibiting the officers' conduct was clearly established at the time of the raid." *Id.* at 535.

In *McLendon*—which involved the third officer's interlocutory appeal in the same underlying case at issue here—this court held that, in light of the relevant caselaw, "an officer must make reasonable, non-feeble efforts to correctly identify the target of a search—even if those efforts prove unsuccessful." 714 F. App'x at 334. On the record before it as viewed on interlocutory appeal, this court determined that McLendon's efforts "fell far short of that standard." *Id.* (footnote omitted). This court in *McLendon* relied in particular on the fact that the officer apparently did not attend the pre-operation briefing; denied knowledge of critical details of the plan (including the identity of the confidential informant and the location and appearance of the target residence); and "made no affirmative effort to learn those details." *Id.* Thus, this court held that McLendon violated clearly established law on the factual record before the court. *Id.* at 335.

In the absence of specific factual findings regarding the district court's denial of Barnes's and McAlpin's motions for summary judgment, we review the record in order "to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *See Kinney*, 367 F.3d at 348 (quoting *Johnson*, 515 U.S. at 319). On the record before us, Barnes and McAlpin attended the briefing prior to the buy-bust operation, although McAlpin stated that he was "in the hallway or on the outskirts of" the "immediate area" where the briefing occurred. The briefing discussed key details including the address of the target residence, a diagram of the residence, and the identity of the confidential informant. Scouten used Google Earth images to familiarize officers with the location and appearance of the target residence. In addition, Scouten mentioned that an unusual van with a "dualie [sic] axle" was parked in the driveway of the target residence. Scouten

also told the officers that they would have to enter the target residence through a side door because the target residence had burglar bars around all windows.

As noted above, Barnes and McAlpin were responsible for maintaining visual contact with the residence to track the confidential informant and ensure that the suspect did not leave. Moreover, Scouten's case report indicates that McAlpin was assigned to carry door-breaching tools and was "to use these tools to gain entry into the residence if needed." According to Scouten's case report, the vehicle in which Barnes and McAlpin rode followed the confidential informant's vehicle. It appears that Barnes, McAlpin, and McLendon were the only ones who followed the confidential informant all the way to the target residence. However, when asked whether he knew the correct address of the target residence from the briefing, Barnes testified, "I knew that area. I didn't know the exact house." McAlpin also testified that he was unaware of the exact address. The district court likely assumed that these facts were sufficiently supported in the record for summary-judgment purposes.

In its opinion and order denying McLendon's summary-judgment motion based on qualified immunity as to the unlawful-entry claim, the district court analogized the facts of the case to those in *Hartsfield. Rankin County*, 2017 WL 1238028, at *11–12. The district court determined that the officers failed to read the search warrant for themselves. *Id.* at *12. The district court also determined that the buy-bust operation occurred during daylight hours; the Gerhart residence was separated by one house from the target residence; and the target residence had distinguishing features that the Gerhart residence lacked, specifically the "dualie [sic] axle" van and the burglar bars. *Id.* In addition, the district court noted the investigative report on the entry into the Gerharts' residence, which "indicates that inattentiveness on the part of the officers was the direct cause of the Gerhart incident." *Id.* at *8.

No. 17-60287

We have emphasized that "[w]hat's reasonable for a particular officer depends on his role in the search." *McLendon*, 714 F. App'x at 335 (quoting *Hunt*, 301 F. App'x at 362 n.8). In *McLendon*, this court stated that "McLendon's lack of preparation is all the more unreasonable because he, Barnes, and McAlpin were the officers entrusted with visually monitoring the target residence and responding first in the case of an emergency." *Id.* at 336. This court determined in *McLendon* that the officer's efforts "fell far short" of objective reasonableness. *Id.* at 334. By this standard, Barnes's and McAlpin's conduct is unreasonable, as well. Consistent with the prior opinion in *McLendon*, we hold that, on the record before us as viewed on interlocutory appeal, Barnes's and McAlpin's conduct was not "consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *See Garrison*, 480 U.S. at 88.[4]

For the reasons explained above, and consistent with this court's holding in *McLendon*, it was clearly established at the time of the alleged unlawful entry here that "an officer must make reasonable, non-feeble efforts to correctly identify the target of a search—even if those efforts prove unsuccessful." *McLendon*, 714 F. App'x at 334. On the record before us, based on our limited standard of review at this interlocutory stage, we conclude that Barnes and McAlpin are not entitled to summary judgment based on qualified immunity on the unlawful-entry claim as a matter of law.

---

[4] Arguments about exigent circumstances do not alter this conclusion. As stated in *McLendon*, "[t]he danger facing the [confidential informant] was undoubtedly an exigent circumstance. But the [confidential informant] was at the target residence, not the Gerhart residence." 714 F. App'x at 336. Barnes's and McAlpin's "determination that the danger was inside the Gerhart residence rather than the target residence was not reasonable" because on this record the officers failed to take reasonable affirmative steps to identify correctly the target residence. *See id.*

14

No. 17-60287

On the facts that have been determined to be sufficiently supported in the record for summary-judgment purposes, viewed in the light most favorable to the Gerharts, the district court correctly determined that Barnes and McAlpin were not entitled to summary judgment based on qualified immunity on the unlawful-entry claim. For the reasons discussed above, we affirm. *See Kinney*, 367 F.3d at 340; *Juarez v. Aguilar*, 666 F.3d 325, 336 (5th Cir. 2011) (affirming the district court's order in part and dismissing the appeal in part).

## B. Excessive Force

McAlpin also appeals the denial of summary judgment on qualified-immunity grounds with regard to the excessive-force claim asserted against him. Whether a use of force is excessive and therefore a constitutional violation depends on whether there was "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)).

We apply the *Graham* factors to determine whether the force used is "excessive" or "unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" with the recognition that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97 (citation omitted). "Claims of excessive

15

force are fact-intensive; whether the force used was 'clearly excessive' and 'clearly unreasonable' depends on 'the facts and circumstances of each particular case.'" *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Graham*, 490 U.S. at 396).

In addition, the injury must be more than *de minimis* to be cognizable. *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). "[T]he amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances." *Ikerd v. Blair*, 101 F.3d 430, 434–35 (5th Cir. 1996). "[E]ven insignificant injuries may support an excessive force claim, as long as they result from unreasonably excessive force . . . ." *Sam v. Richard*, No. 17-30593, 2018 WL 1751566, at \*2 (5th Cir. Apr. 12, 2018) (holding that the plaintiff's alleged injuries, which included minor bleeding, met the "some injury" test of *Alexander v. City of Round Rock*, 854 F.3d 298 (5th Cir. 2017), and that the officer's use of force was objectively unreasonable at the summary-judgment stage).

Here, the parties dispute whether McAlpin kicked Brett Gerhart in the head repeatedly after throwing Brett facedown onto the concrete porch. Joseph Gerhart, Brett's father, testified that he heard his son screaming "I'm down, I'm down," and that McAlpin was kicking his son while his son was already on the ground. Moreover, Brett's father testified that McAlpin then brought Brett into the house, and rather than handcuffing him, pinned Brett to the floor with his knee, shoved a pistol in his face, and said, "If you move, I'll blow your f---ing head off."

However, McAlpin testified that he never hit or kicked Brett Gerhart during the incident in question. McAlpin contends that he found Brett Gerhart facedown on the concrete outside of the front door and merely picked Brett up and took him back inside the house. According to McAlpin, "[t]here is no

16

No. 17-60287

evidence that [Brett's] alleged injuries were caused by McAlpin or [Brett's] fall on the front porch, and these alleged injuries are by no means more than de minimis."

Therefore, on the factual record as viewed on interlocutory appeal, we determine that the district court likely considered McAlpin's alleged repeated kicking of Brett Gerhart to be a genuinely disputed issue. This dispute is material because it relates to a reasonableness analysis under *Graham* regarding whether Brett posed an "immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *See Graham*, 490 U.S. at 396.[5] Our review is limited to whether the "facts are materially sufficient to establish that defendants acted in an objectively unreasonable manner." *Wagner*, 227 F.3d at 320. Because this genuine fact issue is material to whether McAlpin violated clearly established law by using excessive force, we lack jurisdiction over the interlocutory appeal as to McAlpin's excessive-force claim. *Newman*, 703 F.3d at 764 ("[W]e have no jurisdiction to review a district court's determination that there are genuine disputes of fact where we have decided, as a matter of law, that those factual issues are material.").

## IV.

### The Mississippi Tort Claim

The district court also denied the officers summary judgment on the Gerharts' state-law claim of reckless infliction of emotional distress.[6] Barnes

---

[5] *See also Brown v. Lynch*, 524 F. App'x 69, 81 (5th Cir. 2013) (unpublished) (citing *Anderson v. McCaleb*, 480 F. App'x 768, 773 (5th Cir. 2012); *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)) (stating that "[a]t the time of the incident, the law was clearly established in this circuit that repeatedly striking a non-resisting suspect is excessive and unreasonable force").

[6] While the district court refers to the tort claim as one for "reckless" rather than "intentional" infliction of emotional distress, we need not resolve whether the Gerharts properly pleaded a claim for reckless infliction of emotional distress. This is because neither

and McAlpin argue that we should exercise pendent appellate jurisdiction to review the Gerharts' state-law tort claim. The Gerharts do not contest this jurisdictional argument. Nonetheless, we have the responsibility to determine the basis of our jurisdiction. *Alvidres-Reyes v. Reno*, 180 F.3d 199, 203 (5th Cir. 1999).

"The denial of immunity under Mississippi law, like a denial under federal law, is appealable under the collateral order doctrine." *Lampton v. Diaz*, 661 F.3d 897, 899 (5th Cir. 2011); *see also Hinds County v. Perkins*, 64 So. 3d 982, 986 (Miss. 2011) (en banc) (noting that "denials of immunity at the summary judgment stage are reviewed via the interlocutory appeal process"). We have held that "[i]n the interest of judicial economy, this court may exercise its discretion to consider under pendent appellate jurisdiction claims that are closely related to the issue properly before us." *Morin*, 77 F.3d at 119 (footnote omitted). Exercising this discretion is appropriate when, as here, we confront a claim of immunity under state law regarding the same conduct at issue in the qualified-immunity context. *See id.* Otherwise, were we "to refuse to exercise jurisdiction over the state law claims, our refusal would defeat the principal purpose of allowing an appeal of immunity issues before a government employee is forced to go to trial." *Id.* at 119–20 (footnote omitted).

The Mississippi Supreme Court has recognized that "any tort claim filed against a governmental entity or its employee shall be brought only under the [Mississippi Tort Claims Act]." *Conrod v. Holder*, 825 So. 2d 16, 19 (Miss. 2002) (citation omitted). Under Mississippi law:

> An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, *but no employee shall be held personally liable for acts or*

claim here overcomes the Mississippi Tort Claims Act provision of immunity for government employees acting within the scope of employment and sued in their personal capacities.

*omissions occurring within the course and scope of the employee's duties.*

Miss. Code. Ann. § 11-46-7(2) (emphasis added). "The [Mississippi Tort Claims Act] contains an exception to this immunity if an officer's conduct 'constituted fraud, malice, libel, slander, defamation or any criminal offense other than traffic violations' . . . ." *Rogers v. Lee County*, 684 F. App'x 380, 391 (5th Cir. 2017) (unpublished) (quoting Miss. Code. Ann. § 11-46-5(2)).

The Mississippi Supreme Court "has been consistent in rejecting the viability of claims against public employees where their political subdivision employer has been eliminated as a defendant." *Conrod*, 825 So. 2d at 19 (quoting *Cotton v. Paschall*, 782 So. 2d 1215, 1218 (Miss. 2001)). "[U]nless the action is brought solely against an employee acting outside of the scope of his employment, the government entity must be named and sued as the party in interest under the Tort Claims Act." *Id.* (citation omitted). Moreover, it is "a rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment." Miss. Code. Ann. § 11-46-5(3).

The Gerharts do not contest that the officers were acting within the course and scope of their employment here, nor do they argue that Barnes's and McAlpin's conduct constituted malice or criminal behavior. The district court dismissed Defendants Rankin County, Mississippi; Rankin County Sheriff's Office; and McAlpin in his official capacity. The Gerharts allege that McAlpin was an employee of Rankin County and/or Rankin County Sheriff's Office at the time of the incident. In addition, the district court dismissed Defendants City of Pearl, Mississippi and Barnes in his official capacity. The Gerharts allege that Barnes "was at all times material hereto an officer employed by the Defendants, the Pearl Police Department and the City of

No. 17-60287

Pearl, Mississippi" and that "[h]is acts of commission or omission are vicariously attributed to the Defendant, the City of Pearl, Mississippi."

Thus, the immunity provided by the Mississippi Tort Claims Act shields Barnes and McAlpin from personal liability. In allowing the Gerharts to proceed with this tort claim against the officers in their individual capacities, the district court erred. Thus, we reverse that part of the district court's order denying summary judgment on the Gerharts' state-law tort claim against the officers in their individual capacities, and we render judgment on that claim.

V.

Accordingly, we AFFIRM the district court's denial of summary judgment on qualified-immunity grounds as to the unlawful-entry claim; DISMISS for lack of jurisdiction the interlocutory appeal from the denial of summary judgment on qualified immunity for the excessive-force claim; and REVERSE the denial of summary judgment on the Mississippi tort claim and RENDER judgment on that claim.[7]

---

[7] Barnes requests that we reassign the case to a different district court if the case is remanded. McAlpin does not make this request. The Gerharts contend that Defendants' strategic litigation choices rather than the district court's actions are the main reason for the lawsuit spanning six years. In addition, the Gerharts amended their complaint four times, and their fourth amended complaint was filed in December 2016. "A federal court of appeals has the supervisory authority to reassign a case to a different trial judge on remand." *United States v. Winters*, 174 F.3d 478, 487 (5th Cir. 1999); *see Johnson v. Sawyer,* 120 F.3d 1307, 1333 (5th Cir. 1997); 28 U.S.C. § 2106. "However, this is an extraordinary power and should rarely be invoked." *Winters¸* 174 F.3d at 487. This case does not demand such an exercise of our authority, and we deny Barnes's request for reassignment.