# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 10, 2024

Lyle W. Cayce
Clerk

———————

No. 22-50327

———————

Taylor Singleton; Bernice Roundtree, *Individually and as Representative of* the Estate of Charles Roundtree, Jr. and all Statutory Beneficiaries; Davante Snowden,

*Plaintiffs—Appellees*,

*versus*

Steve Casanova, *San Antonio Police Officer*,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:18-CV-1117

———————————————————————

Before Higginbotham, Smith, and Engelhardt, *Circuit Judges*.
Kurt D. Engelhardt, *Circuit Judge*:[*]

This interlocutory appeal arises from the death of Charles Roundtree, Jr., and the injuries sustained by Devante Snowden and Taylor Singleton, when San Antonio Police Officer Steve Casanova twice fired his service weapon into the living room of a private residence at approximately 1:20 a.m. on October 17, 2018. Contending that Casanova had utilized excessive force

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-50327

in violation of the Fourth Amendment's prohibition against unreasonable seizures, Plaintiffs-Appellees Singleton, Snowden, and Bernice Roundtree (hereinafter referred to as "Bernice") sued Casanova and the City of San Antonio, Texas, under 42 U.S.C. § 1983. On appeal, Defendant-Appellant Casanova challenges the district court's denial of his motion for summary judgment seeking dismissal on the basis of qualified immunity. *See Roundtree v. City of San Antonio, Tex., and Steve Casanova*, No. 18-1117, 2022 WL 906405 (W.D. Tex. Mar. 27, 2022). In addition to challenging the district court's qualified immunity rulings, Casanova also argues that Singleton and Bernice lack evidence of the *intentional* acquisition of physical control necessary for a Fourth Amendment violation because Snowden was his only intended target. We AFFIRM and REMAND for further proceedings consistent with this opinion.

## I. Background[1]

On October 17, 2018, at approximately 1:20 a.m., Charles Roundtree, Jr., Davante Snowden, and Taylor Singleton were visiting Hence Williams' home at 217 Roberts Street in San Antonio, Texas. Singleton was at Williams' home because Snowden had asked her to meet him there, after work, to drive him home. But Snowden, who kept his dog at Williams' house, wanted to allow the dog enough time to eat before he and Singleton departed. While waiting, Snowden and Singleton sat in the living room with Roundtree, listening to music. Singleton also was looking at her smartphone, whereas

---

[1] Video and audio footage from body cameras worn by Officers Casanova and Panah is available at:

https://www.ca5.uscourts.gov/opinions/pub/22/22-50327_Cassanova.mp4
https://www.ca5.uscourts.gov/opinions/pub/22/22-50327_Panah.mp4.

Snowden, according to Singleton, was "half [a]sleep." Williams was in his bedroom with Michelle Martinez.

Meanwhile, San Antonio Police Officer Steve Casanova, along with Officers Alexander Garza and James Panah, were outside planning to conduct a "knock and talk investigation" at Williams' house, which they reportedly believed to be a "drug house." According to Casanova, the visit was for the purpose of investigating an alleged assault upon Esteban Preciado that had occurred approximately 15 minutes earlier. Having flagged down Casanova whilst he was patrolling the area (in his police vehicle), Maria Herrera ("Herrera") told Casanova that a young black man had punched Preciado, her husband, in the mouth because he had parked (on the street) outside the man's aunt's house while Herrera was delivering food to a neighboring home.

Herrera described the assailant as a tall and skinny young black man, 20–25 years old, having "no hair" and wearing a gray sweater and blue jeans. Though Casanova claims that Herrera identified Preciado's assailant as having come from 217 Roberts Street, she never identified a specific house in the video. In any event, Casanova surmised that the man was inside Williams' house, at 217 Roberts Street, and told Herrara and Preciado that he would try to "catch the guy." Casanova also told Herrera that, if he could not "catch the guy," he would give them a case number so that they could submit a report.

Shortly thereafter, Casanova, followed by Officer Panah, opened and walked through Williams' front gate.[2]  Traversing the front yard, Casanova

---

[2] The video/audio footage for the events described in this and the remaining paragraphs of this section can be found in the footage from the police officers' body cameras between 0:51 and 16:22 (Officer Casanova) and between 15:29 and 16:04 (Officer Panah).

shined his flashlight on the outside of the house, which was dark, as he approached the front porch. His light revealed a middle-aged black man, John Cotton, eating while sitting on the front porch. Approaching Cotton, Casanova asked if he lived there and if he knew who was staying there. When Cotton said he did not, Casanova asked Cotton to remove his cap, which he did, showing his hair. Casanova then said that he recognized Cotton.[3]

Without questioning Cotton any further, Casanova crossed the porch and approached the house's two front doors, which were located on abutting walls. The doorway to Casanova's left had an outer screen door and inner solid door with a curved window at the top; the doorway to his right had an outer wrought iron ("security") door and an inner wooden door with no window. Upon finding the screen door to be locked, Casanova turned to the right, reaching through an opening in the outer wrought iron door, to knock three times on the closed inner door with his right hand.

On the third knock, the door opened. The parties dispute whether Casanova pushed the door open or whether it swung open solely as a result of Casanova's knocks. In any event, as the door swung open, Casanova's flashlight shone directly into the house's living room, which was illuminated by a ceiling light in the center of the room. At that point, Casanova observed Roundtree sitting on a chair (situated to Casanova's left), whereas Snowden and Singleton sat on either end of an adjacent couch situated between Roundtree's chair and the house's front wall. The living room furniture on which the three sat faced the front doorway, where Casanova stood outside the closed iron door. Beyond being thin, young, black males, neither

---

[3] It is unclear who Cotton is and why he was sitting on the porch of the house located at 217 Roberts Street. Both Snowden and Singleton denied recognizing Cotton; they likewise denied having seen him inside the home.

Roundtree nor Snowden matched Herrera's description of her husband's assailant.[4]

Instead of identifying himself as a police officer upon knocking on the front door, or when it swung open, Casanova simply said: "What's up, man?" At that point, seemingly not realizing that Casanova was a police officer, Snowden, allegedly attempting to see better, quickly stood and stepped toward the front door. At the same time, he exclaimed: "Hey, who the fuck is this?" Singleton remained seated on the couch but, allegedly attempting to better illuminate the area where Casanova stood, pointed the front, lighted side of her phone toward the front door.

According to Snowden and Singleton, they were unable to see who was at the door, or that Casanova wore a police uniform, because they were "blinded" by the beam from Casanova's flashlight. Singleton said that all she could see of the person at the door was "a beanie." Also, Snowden "has a bad eye" and "can't really see that good." Notably, Casanova admits (in his

---

[4] Notably, Herrera told Casanova that the black man who had assaulted her husband had no hair, wore a gray sweater and blue jeans, was in his twenties (between twenty and twenty-five), and was skinny and tall. Glasses were not mentioned. Though Herrera had told Casanova that the assailant had "no hair," Casanova later told other officers that the assailant had "short hair." Yet, when Casanova saw Snowden sitting on the couch, he was wearing glasses, a white t-shirt, a black jacket with a hood (covering his scalp/hair), and khaki pants with zippered pockets, elasticized bottom hems, and no belt. The zipper on the right front pocket, which is black with a white pull string, was open. When the video later shows Snowden leaving the house (after the shooting), he is not wearing the black jacket because he had used it to try to stem Roundtree's blood loss from his chest wound.

In his deposition testimony, Casanova acknowledged that Herrera's "no hair" description meant that he should have been looking for a person with a bald head. He also was asked: "[W]hen you said that Snowden matched the description of the suspect, actually he had on totally different clothing than what she told you; correct?" Casanova responded: "Correct."

deposition testimony) that "at first, [Snowden] did not know who he [Casanova] was." And referencing Snowden's "who the fuck is this" query, Casanova testified: "He looked at me and then I guess it took him awhile to realize that that I was an officer."

As Snowden began to walk forward and across the living room, Casanova suddenly yelled: "Let me see your fucking hands." At almost precisely the same time, Casanova fired two shots, in quick succession, into the living room.[5] According to Snowden, the noise of the gunshots prevented him from hearing Casanova's command.

Upon seeing Casanova's gun, Snowden turned right, away from Casanova, reportedly in an effort to retreat to safety in the rear of the house. But he was not quick enough. Casanova's first bullet entered and exited Snowden's left buttock before also grazing his right buttock. The bullet then continued past Singleton's head (who still sat on the sofa) before becoming lodged in the wall behind her. Tragically, Casanova's second bullet hit Roundtree squarely in the chest.

After the second shot was fired, Casanova left the house's front doorway. Snowden, unaware that the shooter was a police officer and that other officers were outside, quickly shut the front door and followed Singleton to the kitchen where Roundtree had collapsed. The two remained there with Roundtree, futilely trying to stop his bleeding with Snowden's jacket, until the police ordered them out of the house.[6]

_____

[5] The video footage, the district court concluded, shows that Snowden did not have time to comply. And in his deposition testimony, Officer Garza, another police officer on the scene, agreed that Casanova started shooting as he said "Let me see your F-ing hands.").

[6] According to Singleton and Snowden, none of the house's occupants knew that the shooter was a police officer until they were ordered, by police loudspeaker, to come out

Immediately following the shooting, Casanova and Panah "fell back to a position of cover in [] the street" with Casanova claiming that "[Snowden] had a fucking gun" and "[had] pulled it out." As he ran away from the house, Casanova also yelled: "Shots fired! Shots fired!" though he actually was the only person to have discharged a firearm. Then Casanova and another officer went to their vehicles in order to obtain their AR rifles and put on their "bullet-proof" vests.

Yet no gun (other than those held or worn by police officers) is visible in the video footage from the cameras worn by Casanova and Panah. And no one, other than Casanova, ever claimed to have seen a gun inside the house, even after watching Casanova's video. However, officers later claimed to have found a gun (that night) in the back yard of 217 Roberts Street and a matching magazine inside the house's bedroom. They assumed that it was the gun that Casanova professed to have seen, but it lacked Snowden's fingerprints or DNA.[7]

Casanova does not disagree with many of the facts proffered by Singleton and Snowden, including that he never verbally identified himself as a police officer. But he also contends that he, from his position outside the wrought iron door, scanned the three occupants in the living room, sensed

_____

of the house. In fact, Singleton called 911 after the shooting. Snowden testified that had he known it was a police officer at the door, he would have stayed seated on the couch because he would have known who it was and felt safer.

[7] Since Hence Williams and Michelle Martinez were in the back bedroom of the house at 217 Roberts during Casanova's encounter with the plaintiffs, it is not inconceivable that one of them may have dropped a gun (reportedly found in the back yard) out of the bedroom window. In any event, both Singleton and Snowden deny entering the back bedroom after the shooting; instead, they remained in the kitchen, attempting to aid Roundtree, who had collapsed there. Although Martinez left the bedroom after the shooting to assist with Roundtree, Williams reportedly stayed in the bedroom until he exited the house.

the immediate presence of danger, and concluded that the individual [Snowden] seated directly in front of him—about six feet away—matched the description of the assailant. According to Casanova: "[W]ithin seconds" of his "What's up, man?" greeting, "Snowden suddenly turned confrontational, rising from the couch saying: 'Hey, who the fuck is this?'" while reaching for a weapon in his waistband. At that point, Casanova maintains that he yelled: "Hey! Let me see your fucking hands!", unholstered his gun, and fired two shots at Snowden as he moved swiftly to the right [Casanova's left] and did not obey Casanova's command to show his hands. According to Snowden, however, the noise of the gun shots precluded him from hearing any instruction from Casanova.

A week later, Snowden was arrested and charged with felony possession of a firearm. He spent 10 months in jail until he was acquitted by a jury. Thereafter, Singleton, Bernice, and Snowden sued Casanova and the City of San Antonio, Texas, pursuant to 42 U.S.C. § 1983, contending that Casanova had utilized excessive force against them. Casanova filed a motion for summary judgment seeking dismissal on the basis of qualified immunity, which the district court denied. This interlocutory appeal followed.

## II. Applicable Law

Although 42 U.S.C. § 1983 provides a damages remedy, it is not itself a source of substantive rights. *See*, *e.g.*, *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). Rather, it "merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Id*. (quoting *Baker v. McCollan*, 443 U.S. 137, 144 (1979)). Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983. *Id*. For purposes of establishing liability under § 1983, a non-incarcerated person's excessive force claim against a police officer invokes the protection against "unreasonable seizures" provided by the Fourth Amendment of the United States Constitution. *Id*. at 394–95.

No. 22-50327

A. "Seizures"

In the Fourth Amendment context, a "seizure" requires an "intentional acquisition of physical control." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989). Accordingly, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, *through means intentionally applied*." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations omitted) (emphasis in original).

"A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Id.* (citing *California v. Hodari D.*, 499 U.S. 621, 626, n.2 (1991)); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (a police pursuit attempting to seize a person does not amount to a seizure within the meaning of the Fourth Amendment). "When the actions of the police do not show an unambiguous intent to restrain or . . . an individual's submission to a show of governmental authority takes the form of passive acquiescence[,] . . . a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Brendlin*, 551 U.S. at 255 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see also Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004). And "when a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin*, 551 U.S. at 255 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "We do not consider the

suspect's perception of her detention[, however,] when it is accomplished by means of *physical* force." *Flores*, 381 F.3d at 396 (emphasis added).

That the detention must be willful "is implicit in the word 'seizure,' which can hardly be applied to an unknowing act." *Brower*, 489 U.S. at 596. Thus, if an officer unintentionally discharges his gun—whether by accident or negligence—and the bullet hits someone, the victim has not been seized for Fourth Amendment purposes. *Id.* at 596–97; *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir. 1985) (negligent taking of life is not a constitutional deprivation); *see also Gorman v. Sharp*, 893 F.3d 172, 173–75 (5th Cir. 2018) (shooting victim not seized where instructor mistakenly used actual firearm rather than "dummy" firearm); *Watson v. Bryant*, 532 F. App'x 453, 456–59 (5th Cir. 2013) (officer accidentally fired pistol while attempting to handcuff plaintiff).[8]

## B.  "Unreasonable"

"The test of reasonableness under the Fourth Amendment is not capable of . . . mechanical application." *Graham*, 490 U.S. at 396. Rather, in adjudicating excessive force claims, courts evaluate the amount of force used, as well as the reasonableness of resorting to such force, based upon a totality of the particular facts and circumstances of each case. *Id.* "[T]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

---

[8] The same is true if a police car unintentionally hits someone. *Brendlin*, 551 U.S. at 254 (citing *Cnty. of Sacramento*, 523 U.S. at 844). In contrast, a car that crashes into police roadblock "designed to produce a stop by physical impact if voluntary compliance does not occur" *has* been seized. *Brower*, 489 U.S. at 598. "A roadblock, therefore, can be either a show of authority or a means of physical force, depending on whether a suspect stops before reaching it or crashes into it." *Flores*, 381 F.3d at 397.

attempting to evade arrest by flight" are factors relevant to this query. *Id.*; *Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991).

Since *Graham*, our excessive force cases also have emphasized, *inter alia*, the speed with which an officer resorts to using force rather than verbal commands and/or negotiations; the amount of time that an officer has to decide the type and amount of force to use; whether the officer responds with "measured and ascending" actions corresponding with the plaintiff's "escalating verbal and physical resistance" or aggression; whether the plaintiff has ignored the officer's prior command(s); whether the plaintiff has a weapon and/or acts in a manner suggesting intended use of a visible—or hidden— weapon; whether the plaintiff moves outside the officer's line of vision; whether the plaintiff acts in an erratic, unexplained manner; and whether the plaintiff moves toward or away from an officer. *See, e.g.*, *Harmon v. City of Arlington, Tex.,* 16 F.4th 1159, 1164–65 (5th Cir. 2021); *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021); *Batyukova v. Doege*, 994 F.3d 717, 726–29 (5th Cir. 2021); *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 339 (5th Cir. 2020); *Garza v. Briones*, 943 F.3d 740, 746 (5th Cir. 2019); *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017); *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016); *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012); *Manis v. Lawson*, 585 F.3d 839, 844–46 (5th Cir. 2009); *Reese*, 926 F.2d at 500–01. In short, "the information an officer possesses when that officer takes an action impacts [] the objective legal reasonableness of the officer's conduct." *Gutierrez v. City of San Antonio*, 139 F.3d 441, 448 (5th Cir. 1998) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

Importantly, "[a] court must measure the force used under the facts as a reasonable officer would *perceive* them, not necessarily against the historical facts." *Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016) (emphasis in original) (citing *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 234 (5th Cir.

2009)). Similarly, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97. Thus, "'only the facts that were knowable to the defendant officer[]' at the time" are considered. *Garza*, 943 F.3d at 745 (quoting *White v. Pauly*, 580 U.S. 73, 76–77 (2017) (per curiam)); *Tucker v. City of Shreveport*, 998 F.3d 165, 171–73 (5th Cir. 2021).

Likewise, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Hence, the "court must 'be cautious about second-guessing [the] police officer's assessment' of the threat level." *Harmon*, 16 F.4th at 1163 (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam)). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of . . . officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). Even a mistaken belief can still be a reasonable belief. *Wilson v. City of Bastrop*, 26 F.4th 709, 715 (5th Cir. 2022) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

The necessary inquiry, moreover, is an objective one. *Graham*, 490 U.S. at 397. That is, the reasonableness of the challenged conduct is determined without regard to the defendant-officer's underlying, subjective intent or motivation. *Id.* Accordingly, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* (citation omitted).

Even when "deadly force" is used,[9] the standard is still one of reasonableness. *Scott v. Harris*, 550 U.S. 372, 383 (2007). Generally, however, using deadly force is objectively reasonable *only* when the circumstances are such that the officer has probable cause to believe that the suspect poses an immediate *and* significant threat of death or serious physical injury to the officer (or others) and, if feasible, some prior warning has been given. *See Tennessee v. Garner*, 471 U.S. 1, 3, 11–12 (1985); *Arugueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023); *Batyukova*, 994 F.3d at 725; *Garza*, 943 F.3d at 745; *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (en banc); *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018); *Salazar-Limon v. City of Houston*, 826 F.3d 272, 278–79 (5th Cir. 2016); *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011); *Flores*, 381 F.3d at 399; *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 488 (5th Cir. 2001); *Colstun v. Barnhart*, 130 F.3d 96, 99–100 (5th Cir. 1997); *Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996). In other words, "the use of force should be proportional to the [perceived] threat." *Allen v. Hays*, 65 F.4th 736, 744 (5th Cir. 2023) (citing *Brothers*, 837 F.3d at 519). Notably, if these requirements are satisfied, an officer's conduct is not unconstitutional merely because it violates police procedure or the officer acted

---

[9] Our cases recognize that conduct not typically expected to cause serious bodily injury or death can nevertheless have deadly consequences. In recognition of that fact, we have defined "deadly force" as "force carrying with it the substantial risk of causing death or serious bodily harm." *See*, *e.g.*, *Timpa v. Dillard*, 20 F.4th 1020, 1032 (5th Cir. 2021); *Flores*, 381 F.3d at 399; *Gutierrez*, 139 F.3d at 446; *see also Brothers*, 837 F.3d at 519 (force that results in death is not necessarily deadly). In this instance, a fulsome delineation of the types of police conduct constituting deadly force for purposes of the Fourth Amendment is unnecessary. Casanova's conduct—shooting two of the three individuals congregated in the living room of a private residence from his position just outside the room's open door—unquestionably qualifies as deadly force. *See Gutierrez*, 139 F.3d at 446 ("guns represent the paradigmatic example of 'deadly force'").

negligently. *See Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008) (citing *Young*, 775 F.2d at 1350–53).

The existence of the requisite probable cause is determined from the totality of the circumstances as they were—from the officer's perspective—at the time that deadly force was used, *e.g.*, at the moment the officer fired his weapon. *Garza*, 943 F.3d at 745; *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009); *Bazan*, 246 F.3d at 493; *see also Cole*, 935 F.3d at 456 ("what matters is what the defendant officers knew when they shot [the plaintiff]"). Careful attention to timing is important because "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle*, 560 F.3d at 413; *see also Amador v. Vasquez*, 961 F.3d 721, 728–30 (5th Cir. 2020). And, logically, the converse also is true: what is not reasonable one moment can become so in the next.

"Whether a suspect is armed is often the key factor in determining if a threat to an officer justifies the use of deadly force." *Poole*, 13 F.4th at 425. This is true even if, in fact, the suspect did not actually have a gun. *Allen*, 65 F.4th at 744. Again, the relevant perspective is that of a reasonable officer on the scene *without* the benefit of hindsight. Furthermore, "[t]he Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Ramirez,* 542 F.3d at 130 (quoting *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)). "Nevertheless, an officer cannot escape liability any time he claims he saw a gun." *Allen*, 65 F.4th at 744. Instead, "[t]he [relevant] question is whether the officer's belief that he saw a gun was sufficiently reasonable to justify the use of deadly force in light of all the surrounding circumstances." *Id.* at 744 & n.5

(identifying cases in which "other factors . . . led the officer to suspect that the victim would resort to violence").[10]

"Even when a suspect is armed, [however,] a warning must be given, when feasible, before the use of deadly force." *Id.* (quoting *Poole*, 13 F.4th at 425). In those circumstances, a prior warning is a "critical component of risk assessment and de-escalation." *Cole*, 935 F.3d at 453. The feasibility of giving a prior warning is, like the existence of probable cause, determined by the surrounding circumstances, particularly including proximity and time. *Id.* at 453, 455–57 (whether officer had time and opportunity to give a warning before shooting was disputed).

Finally, an officer's failure to employ an alternate, nonlethal means to accomplish a police objective does not automatically render his conduct objectively unreasonable. *See Ramirez*, 542 F.3d at 130 ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."); *see also Harmon*, 16 F.4th at 1165 (speed with which an officer resorts to force is relevant where officer rapidly eschews lesser responses that are plainly available and obviously recommended by the situation).[11] Ultimately, "all that matters is whether [the officer's] actions were reasonable" under the circumstances. *Scott*, 550 U.S. at 384 (officer who struck the plaintiff's car with the officer's bumper, rather than ceasing pursuit, did not act unreasonably, despite the

---

[10] Of course, items other than guns and knives, including motor vehicles, can be deadly weapons in certain circumstances. *See, e.g., Scott*, 550 U.S. at 383; *Brosseau*, 543 U.S. at 200–01; *Crane*, 50 F.4th at 463–64; *Jackson v. Gautreaux*, 3 F.4th 182, 187–88 (5th Cir. 2021).

[11] *See, e.g., Ramirez*, 542 F.3d at 129–30 (quoting *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985)) ("A creative judge engaging in *post hoc* evaluation of police conduct can always imagine some alternative means by which the objectives of the police might have been accomplished.").

resulting crash rendering the plaintiff a quadriplegic, given the uncertainty created by the plaintiff's having ignored the "warning to stop" and intentionally endangered himself and numerous others by engaging in a "reckless, high speed" car chase involving "[m]ultiple police cars" for nearly 10 miles).

## C. Qualified Immunity

Even if a police officer's conduct falls short of the Fourth Amendment's reasonableness requirement, the officer, like other public officials sued under 42 U.S.C. § 1983, is protected by the qualified immunity doctrine. That doctrine "shields public officials sued in their individual capacities from liability for civil damages [under § 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have known." *Kokesh v. Curlee*, 14 F.4th 382, 391 (5th Cir. 2021) (cleaned up). In other words, "[q]ualified immunity shields an officer from suit when [the officer] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [that the officer] confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

"The qualified immunity [doctrine] seeks a proper balance between two competing interests." *Ziglar v. Abbasi*, 582 U.S. 120, 150 (2017). "On one hand, damages suits 'may offer the only realistic avenue for vindication of constitutional guarantees.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). "On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Id.* (quoting *Anderson*, 483 U.S. at 638).

To overcome a defendant-official's good faith assertion of qualified immunity, a plaintiff must satisfy a two-pronged test. First, the plaintiff must demonstrate that "the official violated a statutory or constitutional right."

*Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017). Second, the plaintiff must show that "the right was 'clearly established' at the time of the [official's] challenged conduct." *Id.* (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)). Courts have discretion to decide, in light of the circumstances of the particular case at issue, which of the two prongs to consider first. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009); *Trent v. Wade*, 776 F.3d 368, 377 (2015). They also have "discretion 'to decline entirely to address the' first question . . . [and] 'skip straight to the second question concerning clearly established law.'" *Roque v. Harvel*, 993 F.3d 325, 332 (5th Cir. 2021) (quoting *Morgan*, 659 F.3d at 384).

An official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014); *Melton*, 875 F.3d at 261 ("[A] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

The critical question is "whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Roque*, 993 F.3d at 334; *see also Brosseau*, 543 U.S. at 202 (Stewart, J., dissenting) ("law enforcement officers should never be subject to damages liability for failing to anticipate novel developments in constitutional law"); *Tucker*, 998 F.3d at 174 ("'[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011))). "To subject officers to any broader liability would be to 'disrupt the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of

17

their duties.'" *Ziglar*, 582 U.S. at 151–52 (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). "For then, both as a practical and legal matter, it would be difficult for officials [to] 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Id.* [12]

A plaintiff can demonstrate a clearly established right by identifying a case or "'body of relevant case law' in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution].'" *Joseph*, 981 F.3d at 330 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). "It is not necessary, of course, that 'the very action in question [have]

---

[12] "Allegations that an officer used excessive force in conducting a seizure complicates [this] inquiry" because, in that context, "two 'overlapping objective reasonableness inquir[ies]" may be necessary. *Lytle*, 560 F.3d at 410 (quoting *Saucier*, 533 U.S. at 210 (Ginsburg, J., concurring in the judgment)). Specifically:

> We must . . . answer the constitutional violation question by determining whether the officer's conduct met the Fourth Amendment's reasonableness requirement . . . . [And, if] we find that the officer's conduct was not reasonable under the Fourth Amendment, we must then answer the qualified immunity question by determining whether the law was sufficiently clear [at that time] that a reasonable officer would have known that his conduct violated the constitution. In other words, at this second step, we must ask the somewhat convoluted question of whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable. Despite any seeming similarity between these two questions, they are distinct inquiries[.]

*Id*. Thus, in the excessive force context, "[t]he term 'objective reasonableness' pertains independently to the determination of a constitutional violation and also to the immunity issue." *Mason v. Faul*, 929 F.3d 762, 765–66 (5th Cir. 2019); *see also Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (second prong of the qualified immunity analysis considers "whether conduct of the defendants was objectively unreasonable in light of then clearly established law" (quoting *Felton v. Polles*, 315 F.3d 470, 477 (5th Cir. 2002), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006))). *But see Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004) (en banc) (explaining that, in *Anderson*, 483 U.S. at 638, the Supreme Court "refined the qualified immunity standard by defining 'clearly established' in a way that encompasses the 'objective reasonableness' inquiry[.]").

previously been held unlawful.'" *Ziglar*, 582 U.S. at 151 (quoting *Anderson*, 483 U.S. at 640). Thus, this approach "do[es] not require a case directly on point." *al-Kidd*, 563 U.S. at 741. "But 'in the light of pre-existing law,' the unlawfulness of the officer's conduct 'must be apparent.'" *Ziglar*, 582 U.S. at 151 (quoting *Anderson*, 483 U.S. at 640). Stated differently, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

This need for clarity is particularly important in the excessive force context given that it is "an area of the law in which the result depends very much on the facts of each case[.]" *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal quotation marks omitted). "[T]hus[,] police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id.* (internal quotation marks omitted); *id.* at 105 ("Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful.") (internal quotation marks omitted).

Importantly, however, "general statements of the law are not inherently incapable of giving fair and clear warning" to officers. *Amador,* 961 F.3d at 729–30 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Thus, *Garner* and *Graham* can provide sufficient clarity in "obvious cases." *See Wesby*, 583 U.S. at 64 ("there can be the rare 'obvious case' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances"); *White*, 580 U.S. at 80 (because pre-existing law must make unlawfulness apparent, *Garner* and *Graham* do not by themselves create clearly established law outside "an obvious case"); *Brosseau*, 543 U.S. at 199 ("Of course, in an obvious case, [the general standards set forth in *Graham* and *Garner*] can 'clearly establish' the answer, even without a body of relevant case law."); *see also Crane v. City of Arlington, Tex.*,

50 F.4th 453, 467 (5th Cir. 2022) ("This case is obvious when we accept the facts as we must."); *Cole*, 935 F.3d at 453 (same); *Curran v. Aleshire*, 800 F.3d 656, 663 (5th Cir. 2015) (construing facts in plaintiff's favor, case was "obvious"); *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012) (same).

## D. Burden of Proof and Standard of Review

Casanova appeals the district court's denial of his motion for summary judgment seeking dismissal on grounds of qualified immunity. Under the ordinary summary-judgment standard, the movant bears the initial burden to show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Joseph*, 981 F.3d at 329. But when asserted in good faith via motion for summary judgment, "[a] qualified immunity defense alters the usual summary judgment burden of proof." *Solis v. Serrett*, 31 F.4th 975, 980 (5th Cir. 2022) (quoting *Hanks*, 853 F.3d at 744). Specifically, "the burden [] shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Solis*, 31 F.4th at 980. "In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law." *Joseph*, 981 F.3d at 330.

However, in considering a summary-judgment motion filed by a defendant police officer seeking dismissal of an excessive force claim on grounds of qualified immunity, a district court still must construe "all facts and inferences in the light most favorable to the plaintiff." *Melton*, 875 F.3d at 261. In other words, this aspect of the ordinary summary-judgment standard remains the same *unless* the plaintiff's version of events is "blatantly

contradicted by [video evidence] so that no reasonable jury could believe [it]." *See Scott*, 550 U.S. 380–81.[13]

But, even when the ordinary summary-judgment standard applies, "the court must measure [the] force used under the facts as a reasonable officer *would perceive them.*" *Griggs*, 841 F.3d at 313 (emphasis in original). Thus, the court "first constru[es] disputed historical facts in favor of the non-movant, [and] . . . then ask[s] how a reasonable officer would have perceived those historical facts." *Id.* at 313–14 (quoting *Hill*, 587 F.3d at 234); *see also Buehler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022) (same).

Whether the defendant's conduct violated a constitutional right and whether that right was "clearly established" at the time of the challenged conduct are both questions of law for the court. *Joseph*, 981 F.3d at 331. Likewise, "[w]hether an official's conduct was objectively reasonable," in light of the law that was clearly established at the relevant time, "is a question of law for the court, not a matter of fact for the jury." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). However, "in certain circumstances where

---

[13] The exception to the ordinary summary-judgment standard that *Scott* recognized is a narrow one and the standard for its application is not easily satisfied. *See*, *e.g.*, *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 730 (5th Cir. 2018) ("court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account"); *see also Aguirre*, 995 F.3d at 410 ("*Scott* was not an invitation for trial courts to abandon the standard principles of summary judgment by making credibility determinations or otherwise weighing the parties' opposing evidence against each other any time a video is introduced into evidence. Rather, *Scott* was an exceptional case with an extremely limited holding."); *id.* at 410–11 ("When video evidence is ambiguous or in fact supports a nonmovant's version of events, or when there is any evidence challenging the video's accuracy or completeness, the modified rule from *Scott* has no application.") (internal citations omitted). When *Scott*'s exception to the ordinary summary-judgment standard does apply, the facts should be reviewed "in the light depicted by the videotape." 550 U.S. at 381.

'there remain disputed issues of material fact relative to immunity, the jury, properly instructed, may decide the question.'" *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008) (quoting *Presley v. City of Benbrook*, 4 F.3d 405, 410 (5th Cir. 1993)); *McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000) (if the court has not decided the issue prior to trial, "the jury . . . determine[s] the objective legal reasonableness of the officers' conduct").

The qualified immunity doctrine also impacts the scope of our appellate jurisdiction when, as here, the appellant challenges a district court's denial of his motion for summary judgment seeking dismissal on the basis of qualified immunity. *See Joseph*, 981 F.3d at 329 ("[W]e review earlier than we otherwise would, and we review less than we otherwise would."). That is, "we [ordinarily] do not have jurisdiction to review a denial of a summary judgment motion because such a decision is not final within the meaning of 28 U.S.C. § 1291," which establishes this court's jurisdiction from a district court's "final decision." *Perniciaro v. Lea*, 901 F.3d 241, 250 (5th Cir. 2018) (quoting *Palmer v. Johnson*, 193 F.3d 346, 350 (5th Cir. 1999)); 28 U.S.C. § 1291. Still, "the 'denial of qualified immunity on a motion for summary judgment *is* immediately appealable *if* it is based on a conclusion of law.'" *Id.* (emphasis added). Thus, a district court's determinations of materiality, "the scope of clearly established law[,] and the objective reasonableness of those acts of the defendant that the district court found the plaintiff could prove at trial" are subject to de novo interlocutory review. *Amador*, 961 F.3d at 727 (internal quotation omitted).

Significantly, however, "[t]hough determining whether there is a genuine [dispute] of material fact at summary judgment *is* a question of law," the Supreme Court has excluded sufficiency-of-the-evidence determinations from the interlocutory qualified immunity rulings that are immediately appealable. *See Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009) (emphasis added)

(characterizing the question as "a legal question that sits near the law-fact divide"); *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995) ("defendant entitled to invoke a qualified immunity defense may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial"); *id.* at 313 (defendants cannot immediately appeal this kind of fact-related district court determination); *Cole*, 935 F.3d at 452 ("we cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true" (quoting *Trent*, 776 F.3d at 376)). Thus, in cases where the district court has held that a genuine dispute of material fact exists, "we have jurisdiction to 'review the *materiality* of any factual disputes, but not their *genuineness.*'" *Escobar v. Montee*, 895 F.3d 387, 393 (5th Cir. 2018) (emphasis added) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)); *Tucker*, 998 F.3d at 170–71; *Roque*, 993 F.3d at 332; *see also Gonzales v. Dallas Cnty.*, 249 F.3d 406, 411 (5th Cir. 2001) (interlocutory review of a denial of summary judgment is permitted where disputed facts are not material).[14]

In other words, for cases in which the district court has determined that a genuine dispute of material fact exists, we lack jurisdiction to review the correctness of the plaintiff's version of the facts, or the district court's decision that a genuine fact dispute exists, and instead "consider only whether the district court erred in assessing the legal significance of the conduct . . . deemed sufficiently supported for purposes of summary judgment." *Trent,* 776 F.3d at 376 (quoting *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir.

---

[14] "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Bazan,* 246 F.3d at 489 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

No. 22-50327

2004) (en banc)); *see also Ducksworth v. Landrum*, 62 F.4th 209, 212 (5th Cir. 2023) (same); *Solis,* 31 F.4th at 980 (same).  In short, we cannot review the district court's determination that "there is enough evidence in the record for a jury to conclude that certain facts are true." *Kinney*, 367 F.3d at 347.

The only exception (to this jurisdictional limitation) is when, again, the plaintiff's version of events is so "blatantly contradicted" and "utterly discredited" by video, audio, or photographic evidence.  *See Curran*, 800 F.3d at 663–64 (quoting *Scott*, 550 U.S. at 380) (considering video and photographic evidence); *see also Gracia v. Orta*, 47 F.4th 343, 350–52 and n.2 (5th Cir. 2022) ("After *Scott*, we have held that a court of appeals may consider, on interlocutory appeal, still photographs and video evidence to evaluate whether the district court erred by relying on the plaintiff's version of the facts."); *id.* at 350 (consider "whether the record evidence 'blatantly contradict[s]' or 'utterly discredit[s]' the nonmoving party's version of the facts"); *Byrd v. Cornelius*, 52 F.4th 265, 272 (5th Cir. 2022) (video evidence must conclusively resolve the dispute of material fact).[15]  Otherwise, in appealing a denial of qualified immunity, "the public official must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal."  *Gonzales*, 249 F.3d at 411; *Escobar*, 895 F.3d at 393 ("we accept the plaintiff's version" of factual disputes (quoting *Cooper*, 855 F.3d at 522)).

### III.  District Court's Rulings

Here, the district court denied Casanova's motion for summary judgment based upon its conclusion that material factual disputes prevented it from determining whether his October 17, 2018 conduct was objectively

---

[15] *But see Fuentes v. Riggle*, 611 F. App'x 183, 191 (5th Cir. 2015) (per curiam) (noting that *Scott* "never addresses jurisdiction").

reasonable when considered in light of then-clearly established law. *Round-tree*, No. 18-1117, 2022 WL 906405, at *9–11. In reaching this decision, the court determined that the video footage showed that Snowden had lacked sufficient time to comply with Casanova's command to "let me see your fucking hands" before Casanova fired his weapon. *Id.* at *11. Otherwise, how-ever, the district court found the submitted video evidence inconclusive, and the testimony conflicting, with respect to whether Snowden had moved in such a way that could cause a reasonable officer to believe that he was under threat of immediate serious physical harm. *Id.* Thus, the district court con-cluded, the video evidence "does not undeniably contradict Plaintiffs' ver-sion of events," such "that no reasonable jury could believe it." *Id.* at *7 (quoting *Scott*, 550 U.S. at 380).[16] Based on this assessment, the district court determined that it must apply the ordinary summary judgment standard, *i.e.*, viewing the facts "in the light most favorable to the non-moving part[ies]" and drawing "all justifiable inferences in their favor." *Id.* at *7 (citing *Estate of Aguirre v. City of San Antonio*, 995 F.3d 395, 406, 410–11 (5th Cir. 2021); *accord Amador,* 961 F.3d at 725).

Considering *Graham's* reasonableness factors, the district court con-cluded that the first factor—the "severity of the crime at issue"—militated against a conclusion that Casanova's use of force was objectively reasonable. The district court determined that the reported assault (hitting someone in

---

[16] The district court found the video evidence to be "'too uncertain' to discount Plaintiffs' version." *Id.* at *7 (quoting *Ramirez*, 716 F.3d at 374). Specifically, the district court reasoned: "[i]n some place, the video evidence supports Casanova's version of events, in some places it is ambiguous, and in some places the video supports Plaintiffs' version of events." *Id.* Notably, it is apparent from the district court's opinion that it carefully considered the entirety of the parties' evidentiary submissions, including the audio and video recordings obtained from the police officers' [body-worn] cameras. Indeed, the opinion is replete with citations to those recordings, as well as the numerous deposition transcripts and affidavits included in the record.

the face) "could not signal to an officer that an occupant of 217 Roberts [Street] could, potentially, be armed and dangerous." *Id.* at *9. In reaching this conclusion, the district court considered Casanova's decision to do a "knock and talk" inquiry, emphasizing the absence of evidence that the assailant was armed at the time of the assault and that the reported injury (Preciado's "busted lip") did not appear to require medical attention. *Id.* at *6. Additionally, the available evidence did not conclusively establish that the alleged assailant had retreated into the house located at 217 Roberts Street. *Id.* Finally, given that Snowden's appearance did not match the reported description of the assailant, the district court decided that "it does not appear that Snowden could have been a suspect in the assault." *Id.*

As to the second and third *Graham* factors—whether "the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [] actively resist[ed] arrest or attempt[ed] to evade arrest by flight"—the district court again emphasized the parties' conflicting versions of events.[17] To agree with Casanova's assertion that a reasonable officer would have had probable cause to believe that Snowden had posed an immediate threat of serious physical harm, the court concluded, "would require a finding that Snowden had brandished a weapon, moved toward Casanova in a sudden and aggressive manner, and did not follow Casanova's commands." *Id.* at *9. But, viewing the conflicting evidence in the light most favorable to the plaintiffs, the district court found there to be material factual disputes as to "how Snowden approached the front door [where Casanova stood], whether [Snowden] possessed a gun, whether he reached for anything, whether he grasped something in his waistband, and whether he turned to walk away from Casanova." *Id.* And, while acknowledging that Casanova

---

[17] When an officer uses deadly force, the second *Graham* factor "is generally the most important." *Baker*, 68 F.4th at 247–48.

also argued that Snowden had not complied with his verbal command, the district court emphasized: "Snowden had no time to comply between Casanova shouting, 'let me see your fucking hands,' and firing his weapon." *Id.* at *11. In short, Casanova shot without prior warning.

In the end, considering Casanova's decision to do a "knock and talk" investigation together with the identified factual disputes, the district court determined: "Casanova's belief that his life was in danger, and his action in shooting into 217 Roberts [Street], may not have been objectively reasonable." *Id.* at *9. Accordingly, the district court decided summary judgment was unwarranted because genuine disputes of material fact precluded it from deciding, as matter of law, that Casanova had acted reasonably and, thus, had not utilized excessive force in violation of the Fourth Amendment. *Id.* at *10. The district court thus concluded: "The question of whether a constitutional violation occurred is therefore a matter for the finder of fact to determine." *Id.*

These unresolved factual disputes, the district court reasoned, also precluded it from granting summary judgment based on the "clearly established" prong of the qualified immunity test. The district court explained, in pertinent part:

> Upon the facts this Court must accept as true for the purpose of the instant motion, it would have been sufficiently clear to Casanova that if he or others in his vicinity did not face "a significant threat of death or serious physical injury" at the moment he fired his weapon, shooting at Snowden or into 217 Roberts would violate the occupants' Fourth Amendment rights. . . . With knowledge of *Garner* and *Trammell* [*v. Fruge*, 868 F.3d 332, 343 (5th Cir. 2017)], every reasonable Texas police officer would [have] know[n] that it is objectively unreasonable to shoot someone who is not fleeing, not violent,

not aggressive, and only resisted by turning away from the officer.

*Id.* at *10 (footnotes omitted).

## IV. Analysis

### A. "Objectively Unreasonable in light of Clearly Established Law"

On appeal, Casanova continues to defend his conduct, arguing that the cameras worn by himself and Officer Panah "clearly depict the need for Casanova to [have used] deadly force" in response to the "threat" presented by Snowden's "sudden aggression." Challenging the district court's contrary determination, Casanova contends that it used the wrong standard of review and improperly applied governing law in evaluating his motion for summary judgment. Specifically, he maintains that the district court "misapplied the legal standard of a reasonable officer's perception of critical facts surrounding the use of force by using hindsight to second-guess [his] response." For the following reasons, however, Casanova's arguments are unavailing.

First, we agree with the district court's determination that the plaintiffs' version of events is not so "blatantly contradicted" by video or photographic evidence that "no reasonable jury" could believe it. Thus, the district court properly utilized the ordinary summary judgment standard, *i.e.*, viewing the facts "in the light most favorable to the non-moving part[ies]" and drawing "all justifiable inferences in their favor."

Second, to the extent that Casanova asks that we review the sufficiency of the evidence supporting the factual disputes that the district court has determined to be genuine, in addition to evaluating their materiality, we cannot. As previously explained, our interlocutory appellate jurisdiction is limited. *See supra* Part II. D. That is, because we agree with the district court's assessment of the video and photographic evidence, our

jurisdiction extends only to considering "whether a given course of conduct would be objectively unreasonable in light of clearly established law." *Roque*, 993 F.3d at 332; *see also, e.g., Byrd*, 52 F.4th at 273 (contrasting constrained appellate review for *denials* of summary judgment with thorough interrogation of factual record occurring when summary judgment has been *granted*).

Third, we likewise are not persuaded that the district court erred insofar as it concluded that a given course of conduct would be objectively unreasonable in light of clearly established law. Considering that the "crime at issue" here was simple assault, we find no fault in the district court's determination that the first *Graham* factor—the "severity of the crime at issue"—militates against a conclusion that Casanova's use of force was objectively reasonable. With respect to the second and third *Graham* factors—whether "the suspect posed an immediate threat to the safety of the officers or others, and whether he actively resisted arrest or attempted to evade arrest by flight"—we also agree with the district court's materiality determinations. Specifically, if a jury, upon considering the relevant evidence and making necessary credibility determinations, were to find that Snowden did *not* possess a gun, did *not* grasp or reach for anything in a manner suggesting that he had a gun, walked calmly (or at least not aggressively) toward the doorway in which Casanova stood, and was turning to walk *away* from Casanova when the officer fired two shots, without *prior* warning, in Snowden's direction, the officer's conduct, absent other extenuating circumstances, would not have been objectively reasonable.

Furthermore, a reasonable officer in Casanova's position would have known, on October 17, 2018, that using deadly force in those circumstances (against the occupants of 217 Roberts Street) would violate the Fourth Amendment. In other words, then-applicable law would have given a reasonable officer "fair warning" that such conduct was unlawful. *Hope*, 536 U.S.

at 739; *Wernecke v. Garcia*, 591 F.3d 386, 393 (5th Cir. 2009) (the focus of the inquiry "should be on 'fair warning'"). Indeed, long before October 2018, the Supreme Court's jurisprudence, as well as our own, had repeatedly declared the use of deadly force to be objectively reasonable—for Fourth Amendment purposes—*only* when the officer has probable cause to believe that the suspect poses an immediate and significant threat of death or serious physical injury to the officer or others and, if feasible, has given the suspect prior warning. *See Garner*, 471 U.S. at 3, 11–12; *Cole*, 935 F.3d at 453;[18] *Romero*, 888 F.3d at 176; *Salazar-Limon*, 826 F.3d at 278–79; *Rockwell*, 664 F.3d at 991; *Flores*, 381 F.3d at 399; *Mace*, 333 F.3d at 624; *Bazan*, 246 F.3d at 488; *Colstun*,130 F.3d at 99–100; *Baker*, 75 F.3d at 198; *see also Scott*, 550 U.S. at 383 (distinguishing situation in which an officer shoots at a person proceeding on foot and one in which an officer "bumps" a fleeing suspect's vehicle with his police vehicle).

Again, we are mindful that the Supreme Court has emphasized that the legal principles recognized in *Graham* and *Garner* provide sufficient clarity only in "obvious cases." But, if the triable factual disputes identified by the district court are resolved in the plaintiffs' favor, this case, as in *Crane* and *Cole*, *is* an "obvious case." *See Crane*, 50 F.4th at 457; *Cole*, 935 F.3d at 453. In other words, at this juncture of the proceedings, *unlike* in excessive force cases where summary judgment on grounds of qualified immunity *has* been warranted, the pertinent unanswered questions here concern

---

[18] Though our last en banc decision in *Cole v. Carson* was not issued until August 2019, it concluded that the same standard governed police conduct occurring in October 2010.

underlying matters of fact to be decided by a jury, *not* governing legal principles or their proper application to a particular set of facts.[19]

Notably, today's ruling does not forever close the door on Casanova's qualified immunity defense. If additional discovery provides information revealing a basis for revisiting the topic prior to trial, a request for appropriate relief can be presented to the district court. *Baker*, 68 F.4th at 251. Objective reasonableness also can be considered, as a matter of law at the close of the trial, *if* the admitted evidence reveals that key factual issues are no longer genuinely disputed. *See*, *e.g.*, *Flores*, 381 F.3d at 402. Finally, qualified immunity remains a possible defense and question to be determined by the jury.

---

[19] *See, e.g.*, *White*, 580 U.S. at 77–81 (vacating denial of summary judgment because clearly established requirement not met on record described by court of appeals); *Baker v. Coburn*, 68 F.4th 240, 246 (5th Cir. 2023) (summary judgment affirmed regarding first round of shots because officer lacked prior notice that his conduct violated Fourth Amendment); *Tucker*, 998 F.3d at 165 (reversing denial of summary judgment because disputed facts were not material and relevant law was not clearly established); *Batyukova*, 994 F.3d at 726–29 (affirming summary judgment because plaintiff did not identify clearly established law prohibiting officer's use of deadly force); *Cloud v. Stone*, 993 F.3d 379, 387 (5th Cir. 2021) (affirming summary judgment because disputed facts were irrelevant and undisputed facts supported officer's reasonable belief of threatened physical harm); *Garza,* 943 F.3d at 743-48 (affirming summary judgment because material facts were undisputed and justified officers' use of deadly force); *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 476–77 (5th Cir. 2019) (per curiam) (affirming summary judgment because the plaintiff's right to be free from excessive force was not clearly established by applicable law); *Salazar-Limon*, 826 F.3d at 278–79 (affirming summary judgment because material facts were undisputed and did not establish a violation of the plaintiff's rights); *Watson*, 532 F. App'x at 456 (existence of genuine dispute of immaterial fact will not overcome qualified immunity); *Manis*, 585 F.3d at 844–47 (reversing denial of summary judgment because material facts were undisputed and applicable caselaw did not clearly establish officer's conduct violated Fourth Amendment); *Ramirez*, 542 F.3d at 128–31 (reversing denial of summary judgment because the only disputed questions were questions of law not fact).

No. 22-50327

*See* Fifth Circuit Pattern Jury Instructions (Civil Cases) § 10.3 (2020).

Of course, we are well aware that qualified immunity is "an immunity from suit rather than a mere defense to liability" that "is effectively lost if a case is erroneously permitted to go to trial." *Pearson*, 555 U.S. at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted)). Accordingly, a defendant who is entitled to qualified immunity is to be afforded its protection as soon as the defense's applicability is determinable. *Cole*, 935 F.3d at 457. But, "[]though it is preferable to resolve the qualified immunity question at the earliest possible stage of litigation, this preference does not give judges license to take inherently factual questions away from the jury." *Brosseau*, 543 U.S. at 206 (Stewart, J., dissenting). Indeed, though the qualified immunity doctrine is intended to free worthy public officials from the burdens and uncertainty of litigation sooner rather than later, it is *not* uncommon for factual disputes to preclude summary disposition in excessive force cases.[20]

---

[20] *See, e.g.*, *Baker*, 68 F.4th at 251 (reversing summary judgment regarding second round of shots because objective reasonableness of officers' conduct depended upon jury's acceptance of officers' account of the shooting); *Byrd*, 52 F.4th at 274 (dismissing appeal of denial of summary judgment because video evidence did not conclusively resolve material factual disputes identified by the district court); *Crane*, 50 F.4th at 461–67 (reversing grant of summary judgment on excessive force claim because law was sufficiently clear and factual disputes existed); *Poole*, 13 F.4th at 423–25 (affirming denial of summary judgment because of factual dispute regarding whether suspect was visibly unarmed); *Roque*, 993 F.3d at 339 (affirming denial of summary judgment based on existence of genuine disputes of material fact); *Cole*, 935 F.3d at 453 (affirming denial of summary judgment because officers' disputed conduct, viewed in light most favorable to the plaintiffs, violated clearly established law); *Mason v. City-Parish Consol. Gov't*, 806 F.3d 268, 276–78 (5th Cir. 2015) (reversing summary judgment for officer because genuine disputes of fact existed regarding whether victim was incapacitated and moved in a threatening manner before final two shots were fired); *Flores*, 381 F.3d at 399–402 (affirming denial of summary judgment because of genuine issues of fact regarding whether

No. 22-50327

This case is no exception. Thus, although Casanova *ultimately* might be entitled to prevail against the plaintiffs regarding the objective reasonableness of his conduct, he presently cannot on this record.

## B. "Intentional Use of Force"

In addition to challenging the district court's qualified immunity rulings regarding the objective reasonableness of his conduct, Casanova also argues that Singleton's and Bernice's claims lack the *intentional* acquisition of physical control required to establish a Fourth Amendment violation. *Brower*, 489 U.S. at 596. Specifically, Casanova does not dispute that he twice fired his gun intentionally, that the first bullet, after hitting Snowden, narrowly missed Singleton's head, or that the second bullet fatally wounded Roundtree. But, he contends, both bullets were aimed at and intended for Snowden, *not* Roundtree or Singleton, such that any termination of either's freedom of movement was purely accidental and not "through *means intentionally applied*" for purposes of the Fourth Amendment. Thus, Casanova argues that Roundtree and Singleton were not "seized" for purposes of the Fourth Amendment because Roundtree was an "unintended

_____

officer used deadly force and reasonably believed the plaintiff posed any danger to him or someone else); *Bazan*, 246 F.3d at 493 (dismissing police officer's appeal of denial of summary judgment because factual disputes identified by district court were material); *Baker*, 75 F.3d at 198 (summary judgment for officer reversed because factual disputes regarding the decedent's conduct, the officer's warning, the number of shots fired and the nature of the decedent's wounds precluded judgment as a matter of law); *see also Moore v. Indehar*, 514 F.3d 756, 762 (8th Cir. 2008) ("[W]here questions of historical fact exist, the jury must resolve those questions so that the court may make the ultimate legal determination of whether the officers' actions were objectively reasonable in light of clearly established law.") (quoting *Littrell v. Franklin*, 388 F.3d 578, 586 (8th Cir. 2004)).

victim" and Singleton, who was not shot, was "merely a person present" rather than the "object of direct police action."[21]

Notably, the Supreme Court stated, in *Brower*: "A seizure occurs even when an unintended person or thing is the object of the detention or taking, *see Hill v. California*, 401 U.S. 797, 802–805 (1971); *cf. Maryland v. Garrison*, 480 U.S. 79, 85–89 (1987), but the detention or taking itself must be willful." 489 U.S. at 596 (emphasis added). And, in 2007, the Supreme Court reiterated that an "unintended person . . . [may be] the object of the detention," so long as the detention is "willful" and not merely the consequence of "an unknowing act." *Brendlin*, 551 U.S. at 254 (quoting *Brower*, 489 U.S. at 596).

However, as other courts have explained, *Hill* and *Garrison* considered whether instances of mistaken identity invalidated the probable cause necessary for the warrants at issue there, *not* allegations that an officer intended to shoot one person but, missing his target, inadvertently shot someone else. *See, e.g., Moore*, 514 F.3d 760–62.[22] In other words, the quoted

---

[21] That Singleton's claimed injuries are merely psychological is immaterial. "Psychological injuries may sustain a Fourth Amendment claim." *Flores*, 381 F.3d at 398. Furthermore, Singleton's Fourth Amendment claim, as pled, is not premised on her having seen her friends shot. *See Harmon*, 16 F.4th at 1168 ("no constitutional right to be free from witnessing . . . police action" exists (quoting *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 172 (5th Cir. 1985))). Rather, Singleton maintains that she too was the object of direct police action, not a mere bystander, and only narrowly, and fortuitously, escaped physical contact with Casanova's bullets.

[22] In *Hill*, the police intended to arrest Hill, but the man arrested (who was in Hill's apartment at the time of the arrest and initially thought to be Hill) actually was Miller. The mistaken identity, the Court determined, did not invalidate probable cause for the arrest because the police had had a reasonable, good-faith belief that the arrestee actually was Hill. Thus, evidence obtained during the search of the apartment incident to that arrest was admissible. *See* 401 U.S. at 802–04. In *Garrison*, the police obtained a search warrant for "the third floor apartment" at a specific address mistakenly believing that there was only one apartment on the third floor, occupied by Lawrence McWebb, when there actually

language from *Brower* has *not* been construed to establish an all-purpose "transferred intent" rule  for § 1983 claims asserting Fourth Amendment violations.[23] In short, with excessive force claims, each plaintiff seeking relief must establish that the defendant-officer intended to use force against his or her person, not someone else's.

Consequently, § 1983 claims asserted against law enforcement officers for unintended injuries suffered by innocent hostages lack the willful detention required to establish a Fourth Amendment seizure. *See*, *e.g.*, *Pearce v. Doe*, 849 F. App'x 472, 473–75 (5th Cir. 2021);  *see also Moore*, 514 F.3d at 760 (collecting cases);  *Estate of Macias v. Tex. Dept. of Public Safety*, No. 20-460, 2021 WL 495877, at *11 (Feb. 9, 2021 W.D. Tex.) (same).  In other circumstances, however, an officer's intentional conduct may target more than one person. *See Harmon*, 16 F.4th at 1162, 1168 (emphasizing that Harmon had alleged that the officer reached *past* Harmon to shoot the car's driver as opposed to "fir[ing] indiscriminately into the car"); *Coon v. Ledbetter*, 780 F.2d 1158, 1159–61 (5th Cir. 1986) (officer fired into trailer home knowing that Coon's four-year old daughter also was inside); *Moore*, 514 F.3d at 759–62 (plaintiff defeated summary judgment on excessive force claim by pointing to evidence supporting assertion that the officer's intentionally fired shots were aimed at both Moore and Loyd).

_____

were two apartments.  Because the agents acted in good faith, their mistake did not invalidate the search warrant and the seizure of evidence obtained during the search of the second apartment did not violate the Fourth Amendment. *See* 480 U.S. at 85–89.

[23] *Brendlin* is not to the contrary.  There, consistent with the prevailing view of the federal courts of appeals, the Supreme Court held that a *passenger* in a private car is, like the *driver*, seized in a traffic stop, recognizing that, "in such circumstances, any reasonable passenger would have understood the police officer[] to be exercising control to the point that no one in the [stopped] car was free to depart without police permission." *Brendlin*, 551 U.S. at 251, 258, 263.

Ultimately, the question is one of intent. Unlike in cases involving innocent hostages or bystanders injured by an obviously stray, widely off-target, or ricocheted bullet, it is far from obvious here that Snowden was Casanova's *only* target. Specifically, it is not entirely clear whether the shots fired by Casanova were intended only for Snowden, or for Snowden and Roundtree, or for any and all of the three people (Snowden, Roundtree, and Singleton) in the living room of Williams' house.

Maintaining that all three occupants of Williams' living room were targets, Singleton and Bernice contend that "circumstantial evidence shows . . . [Snowden's] shooting was intentionally malicious and indiscriminate, and that [Casanova's] attitude was one of shoot first, ask questions later." In support of their argument, the plaintiffs emphasize that Casanova went to Williams' house to look for someone whose description did not match Snowden's appearance, as Casanova could well see from his position in the open doorway. Likewise, from that position, directly across from where they were calmly seated, close together, Casanova could see that the trio was contained in the house's front room with the only means of exit directly in his line of fire. Furthermore, the three were in close range, less than ten feet away, and at the time Casanova opened fire, Snowden had moved even closer to Singleton and Roundtree, thus increasing the likelihood that a bullet fired at any one of them would hit another. Yet, Casanova still fired, without prior warning, maintaining that he was confident about his accuracy and did not fire recklessly. Thus, the plaintiffs contend, the evidence shows that the bullets were specifically intended for any one of the three or, at a minimum, the first was aimed at Snowden and Singleton and the second at Roundtree.

The district court's opinion and order includes little discussion of this issue, seemingly construing the plaintiffs' submissions to assert that Casanova's shots were directed "into the living room of the house at 217 Roberts Street" and fired "at Snowden, Roundtree, and Singleton."

No. 22-50327

*Roundtree*, 2022 WL 906405, at *1, 7–11. And the court denied Casanova's motion for summary judgment—as a whole, not in part—on grounds that genuine disputes of material fact preclude judgment as a matter of law.

On this record, and considering our limited interlocutory jurisdiction, we pretermit any further consideration of this issue at this juncture. The district court may consider, on remand, whether the record is such that additional pretrial rulings can be made relative to the scope of Casanova's intent regarding the two shots fired by him on October 17, 2018. And, if not, we are confident that, if warranted, the district court will reconsider the issue at trial, as a matter of law, if the admitted evidence reveals that key factual issues are no longer genuinely disputed.

## V. Conclusion

In this interlocutory appeal of the district court's denial of Officer Steve Casanova's motion seeking summary judgment, on grounds of qualified immunity, our review is limited to deciding whether, given the facts assumed by the district court to be true, such conduct would have been objectively unreasonable, in light of clearly established law, on October 17, 2018. We agree that it would have been. We decide this at the early, summary judgment state of the proceeding and express no view as to the ultimate outcome. Additionally, at this juncture of the proceedings, we pretermit further consideration of whether Casanova's conduct relative to Singleton and Roundtree was intentional rather than inadvertent. Accordingly, we AFFIRM and REMAND this matter for further proceedings consistent with this opinion.